# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### PINE BLUFF DIVISION

### <u>THIS IS A CAPITAL CASE</u>

**RODERICK LESHUN RANKIN**                                         **PETITIONER**

**vs.**                                    **5:06-cv-00228-JM**

**DEXTER PAYNE, Director,**
**Arkansas Division of Correction**                              **RESPONDENT**

### <u>ORDER</u>

**1.**  Roderick Rankin is an inmate in the Arkansas Department of Correction under three death sentences for the capital murders of Zena Reynolds, Ernestine Halford, and Nathaniel Halford.  Having exhausted his state remedies, Rankin petitions this Court for federal *habeas* relief. For the reasons stated herein, the petition is denied.

**2.**  Rankin admitted in a police interview that he killed the victims.  He argued at trial that he was pressured into making a false confession, and that there was no physical evidence connecting him to the crime scene.  A Jefferson County jury rejected the defense theory, finding Rankin guilty of three counts of capital murder.  In the penalty phase, the jury unanimously found one aggravating circumstance—in the commission of capital murder, Rankin knowingly created a great risk of death to a person other than the victim.  The jury unanimously found two mitigating circumstances probably existed:  (1) the murder was committed while Rankin was under an extreme mental or emotional disturbance, and (2) Rankin had no significant history of prior criminal activity at the time of the murder.  Deciding the aggravator outweighed mitigating circumstances found by any juror to exist, the jury chose the death sentence for each capital-murder.

On appeal, the Arkansas Supreme Court remanded the case and directed the trial court to hold a hearing on Rankin's pretrial motion to suppress his statement. *Rankin v. State (Rankin I),* 329 Ark. 379, 948 S.W.3d 397 (1997). After a hearing, the trial court denied the suppression motion. The Arkansas Supreme Court affirmed. *Rankin v. State (Rankin II)*, 338 Ark. 723, 1 S.W.3d 14 (1999). The Jefferson County Circuit Court denied post-conviction relief, and the Arkansas Supreme Court affirmed. *Rankin v. State (Rankin III),* 365 Ark. 255, 227 S.W.3d 924 (2006). Rankin timely filed his petition for federal *habeas corpus* relief.

**3. Factual Background.** At the time of the murders, Rankin was nineteen years old. He knew the victims. His brother, Rodney Rankin, and Zena previously lived together, and they had two children. Rankin met Zena's sister, Sonyae Reynolds, through his brother. Their dating relationship was erratic and tumultuous. Rankin twice became jealous of Sonyae's other relationships and hit her.

In the early morning hours of December 27, 1994, the Halfords were at their Pine Bluff apartment. Ernestine's daughters—Sonyae and Zena—and Zena's two small children were also there. Zena and her children were in the living room; the Halfords and Sonyae were asleep in their bedrooms. When Sonyae heard the front door bust open, she hid in her bedroom closet. She heard six gunshots. The intruder opened Sonyae's bedroom door "a little" and then ran out of the apartment. Trial Record 1050. After waiting a few minutes, Sonyae left her bedroom and found the slain bodies of her mother, stepfather, and sister. Each died from a contact gunshot wound to the head. Nathaniel was shot twice in the head, and Ernestine was also shot in the arm. Zena's children were unharmed.

Sonyae told the 911 operator that she could not identify the killer. Responding officers found the Halfords' front door kicked in. The door frame was broken, and there was a shoeprint

on the front-door Christmas decoration.  Sonyae told the investigator that she glimpsed one intruder through her bedroom doorway, but that he was too short to be Rankin.  She said the intruder was wearing a black jacket with gray stripes and writing on the back, and blue Dickie pants.

At the time of the murders, Sonyae and Rankin were no longer together.  She believed Rankin had also been in the apartment because he recently threatened her and her family.  She was aware a witness saw a "tall boy" running between the apartment buildings; she thought that person was Rankin, who is over six feet tall.  Trial Record 1092.  Sonyae directed investigators to the home of Rankin's mother, Elaine Trimble.  Rankin and Rodney lived there, too.  When investigators arrived, Rankin and his mother were at home.  Rankin answered the door.  He had been laying on the living room couch.  With Trimble's consent, investigators searched her home and found a black and gray Starter jacket[1] (with a white "Sox" emblem on the back) behind a catty-corner chest-of-drawers in Rankin's bedroom.  They also seized two pairs of shoes—a pair of black athletic shoes lying next to the living room couch, and a pair of navy Reebok athletic shoes found underneath the couch.  After Trimble stopped the search, investigators arrested Rankin and transported him to the Pine Bluff police station.  With a search warrant, investigators returned to the home and found six pairs of dark-colored jeans behind Rankin's chest-of-drawers.

Rankin initially denied committing the murders.  While he was being questioned, investigators found the murder weapon—a nine-millimeter Hi-Point pistol—in a wooded area behind the apartment complex where the Halfords lived.  After Rankin was shown the pistol, he gave an audio-recorded statement and admitted that he killed Zena and the Halfords.  He told investigators that he went alone to the Halfords' apartment.  Investigators discovered the pistol

---

[1] There was witness testimony that a Starter jacket is a bomber jacket often worn by NBA players.

was stolen during a recent burglary of Ernest Demmings' home.  Returning to Trimble's house, investigators seized a VCR and CDs taken during the same burglary.

Sonyae's testimony was different than her police interview.  She testified that she knew the killer was Rankin because, when he opened her bedroom door that night, she recognized his black and gray Starter jacket and his navy and white Reeboks.  She said that he was wearing jeans. Sonyae identified the seized jacket and shoes as those worn by Rankin.  The Halfords' neighbor, Sharon Carter, testified that, on the night of the murders, she heard gunshots and looked out her window.  She said that she saw a man, running towards the woods and shooting in the air.  She described the man as tall; and wearing a dark Starter jacket, black athletic shoes, a stocking cap, and dark jeans.  She did not see the man's face or any writing on the jacket.

Rankin also testified at trial.  He admitted the seized Starter jacket belonged to him, and he said that he had a pair of Reeboks.  But he said that he was not wearing either on the night of the murders.  He told the jury that he put the jacket and jeans behind his chest-of-drawers.  He said that his room did not have a place for dirty clothes, and that he planned to take them to the cleaners. Rankin testified that he kept his clean clothes in his brother's closet because his bedroom did not have one.  Rankin said that he was wearing a brown coat and black-and-white Fila shoes on the night of the murders.  He said that he hung the brown coat in his brother's closet, and that he wore the Filas to the police station after he was arrested.  He testified a friend, Jeremy Langrell, brought the VCR to his mother's house and was trying to sell it.  He told the jury that he confessed to the murders only because he was concerned that his mother and brother were being arrested.  He said his mother "had already been through a lot."  Trial Record 1445.  He said that Rodney was angry about the break-up with Zena, and that he was "smoking crack . . . and upset" and "acting funny." Trial Record 1447.  Rankin testified the investigators gave him details about the murder before

recording his statement.  He said that he often responded to their yes-no questions with "I don't know" because he did not know the answers.

**4.  Procedural History.**  Early on, this Court[2] stayed the federal proceedings and held the case in abeyance while Rankin pursued relief on unexhausted claims in state court.  *Doc. No. 62.* The Eighth Circuit dismissed an appeal of that order for lack of jurisdiction.  *Rankin v. Norris*, 396 Fed. Appx. 325 (8th Cir. 2010) (*per curiam*).  During the stay of federal proceedings, the Court permitted Rankin to temporarily reopen the *habeas* case to preserve the testimony of Pastor Augustine Bailey, an ordained minister and counselor at the Evangelical Outreach Church in Pine Bluff, who was in failing health.  The Court ordered Rankin to make the deposition part of the *habeas* record.  *Doc. No. 80.*  Pastor Bailey had counseled Elaine Trimble and Rodney.  She stated in her deposition that Rodney twice confessed to her that he killed the victims.  *Doc. No. 82-2.*

In state court, Rankin sought a recall of the mandate in his Rule 37 proceeding[3] based on three arguments:  (1) actual innocence of capital murder; (2) ineligibility for the death penalty due to intellectual disability; and (3) defective Rule 37 proceedings due to incompetent and unqualified counsel, and judicial bias.  In the same paper, Rankin argued that he was entitled to seek *coram-nobis* relief in circuit court for three reasons:  (1) He is actually innocent based on a third-party confession, (2) he was incompetent to stand trial due to intellectual disability and mental illness, and (3) the prosecutor withheld material evidence at trial.  *Doc. No. 103-1.*  Rankin attached to the motion a 659-page Appendix with supporting documents.  *Doc. No. 104-1 through 104-6.*  In a

---

[2] After the original *habeas* petition was filed, this case was assigned to the Honorable James M. Moody, Sr.  *Doc. No. 2.*  Due to Judge Moody, Sr.'s retirement, the case was reassigned on March 10, 2014.  *Doc. No. 120.*

[3] Rankin filed the Motion to Recall Mandate and/or Reinvest Jurisdiction with the Circuit Court to Consider a Writ of *Error Coram Nobis* in his direct-appeal case, *Rankin v. State*, No. CR-96-1025 (Ark. April 13, 2011).  His argument, however, was that he was entitled to a recall of the mandate in the Rule 37 proceeding.  *Doc. 103-1.*

*per curiam* order, the Arkansas Supreme Court summarily denied the motion. *Doc. No. 105-1 at 17*; *Rankin v. State*, No. CR-96-1025 (Ark. May 12, 2011).

After returning to federal court, Rankin filed an amended *habeas* petition and a supplemental memorandum. *Doc. Nos. 115, 129.* He also filed supplemental authority. *Doc. Nos. 169, 174.* In these papers, Rankin continues to argue that he is innocent, and that his brother, Rodney, committed the murders.

**5. Standard Of Review.** Rankin, a state prisoner, may seek a writ of *habeas corpus* in federal court, if he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). As the United States Supreme Court recently emphasized, *habeas* relief is an "extraordinary remedy," guarding against only "extreme malfunctions in the state criminal justice systems." *Shinn v. Martinez Ramirez,* 596 U.S. __, 142 S. Ct. 1718, 1731 (2022) (quotations omitted); *Brown v. Davenport* (*Mike Brown*), 596 U.S. __, 142 S. Ct. 1510, 1523-24 (2022) (quotations omitted). The *habeas* statutory scheme, moreover, is "designed to strongly discourage" petitioners from offering new evidence. *Shoop v. Twyford*, 596 U.S. __, 142 S. Ct. 2037, 2044 (2022) (quotations omitted).

Before seeking *habeas* review, Rankin must have exhausted available state remedies by fairly presenting his claim in state court. *Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). Exhaustion occurs through the state court's "established appellate review process." *Dansby v. Hobbs,* 766 F.3d 809, 829 (8th Cir. 2014). In Arkansas state courts, *coram-nobis* relief is the prescribed remedy when there is "some fact that would have prevented [the judgment] if it had been known to the trial court and which, through no negligence or fault of the defendant, was not brought forward before rendition of the judgment."

*Carter v. State*, 2016 Ark. 448, *2.  A motion to recall the mandate is not part of the state court's established review process.  *Dansby,* 766 F.3d at 829.

This Court will not review questions of federal law decided in state court, if the state-court decision was based on "a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman*, 501 U.S. at 729.  A "firmly established and regularly followed" state procedural rule, even if discretionary, can be an adequate ground to bar *habeas* review.  *Beard v. Kindler*, 558 U.S. 53, 60 (2009) (quotations omitted).  Procedural default also occurs when a petitioner fails to present a claim in state court, and a state-court remedy is no longer available.  *O'Sullivan*, 526 U.S. at 848.  A procedural default can occur at any point during state-court review:  at trial, on direct appeal, or during post-conviction proceedings.  *Kilmartin v. Kemna*, 253 F.3d 1087, 1088 (8th Cir. 2001).

If a claim is procedurally defaulted, this Court can consider it only if Rankin establishes either cause for the default and actual prejudice, or that the default will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.  To establish cause, Rankin must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  The prejudice element generally requires Rankin to show "not merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *Id.* at 494 (emphasis original and quotations omitted).

On claims adjudicated on the merits in state court, this Court may grant *habeas* relief only if Rankin satisfies statutory requirements and United States Supreme Court "precedents governing the appropriate exercise of equitable discretion."  *Mike Brown*, 142 S. Ct. at 1524.  Rankin must demonstrate the state-court adjudication "(1) resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A decision is contrary to federal law if the state court "applies a rule that contradicts the governing law" set out by the United States Supreme Court, or if it faces facts "materially indistinguishable" from a Supreme Court case and decides differently.  *Brown v. Payton*, 544 U.S. 133, 141 (2005).  Rankin also must satisfy the *Brecht* test for assessing the state-court error's prejudicial effect.  *Mike Brown*, 142 S. Ct. at 1524.  He must show the error had "substantial and injurious effect or influence" on the verdict or sentence.  *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993) (quotations omitted).

**6.  Caselaw Development.**  Because there is no constitutional right to counsel in state collateral proceedings, post-conviction counsel's ineffectiveness cannot constitute cause to excuse procedural default.  *Coleman,* 501 U.S. at 755–57.  In 2012, the United States Supreme Court recognized an equitable exception, holding that, when state procedures require petitioners to raise ineffectiveness-of-trial-counsel claims in collateral proceedings, attorney error in the initial collateral-review case is cause to excuse procedural default of substantial ineffectiveness-of-trial-counsel claims.  *Martinez v. Ryan,* 566 U.S. 1, 14 (2012).  A substantial ineffectiveness claim is one that has "some merit."  *Id.*

The Supreme Court expanded the equitable exception to apply when state procedural rules do not provide a "meaningful opportunity" to raise ineffectiveness-of-trial-counsel claims on direct appeal.  *Trevino v. Thaler*, 569 U.S. 413, 428 (2013).  The Court declined to extend the *Martinez-Trevino* exception beyond procedurally defaulted ineffectiveness-of-trial-counsel claims.  *Davila v. Davis*, 582 U.S. __, 137 S. Ct. 2058 (2017).  The *Martinez-Trevino* equitable exception applies

in *habeas* review of Arkansas state-court decisions. *Sasser v. Hobbs,* 735 F.3d 833, 851–53 (8th Cir. 2013). Under prior circuit precedent, evidentiary hearings on procedurally defaulted ineffectiveness-of-trial-counsel claims were warranted when the claims were "potentially meritorious." *Id.* at 851.

In *Shinn v. Martinez Ramirez*, the United States Supreme Court eliminated the possibility of evidentiary hearings under the potentially meritorious rubric. 142 S. Ct. 1718. The Supreme Court held 28 U.S.C. § 2254(e)(2)'s stringent evidentiary restrictions apply to procedurally defaulted ineffectiveness-of-trial-counsel claims. *Id.* at 1728. Pursuant to the statute, when a *habeas* petitioner "has failed to develop the factual basis of a claim" in state court, a federal court may not hold an evidentiary hearing on that claim absent satisfaction of one of two narrow exceptions. 28 U.S.C. § 2254(e)(2). The Supreme Court held that, because there is no constitutional right to post-conviction counsel, that lawyer's lack of diligence in developing the state-court record is attributable to the petitioner. 142 S. Ct. at 1734–35.

Under *Shinn* and 28 U.S.C. § 2254(e)(2), federal courts may not consider evidence beyond the state-court record in evaluating the merits of a procedurally defaulted ineffectiveness-of-trial-counsel claim. *Id.* The Supreme Court further concluded that, without the availability of new evidence for merits review, a *Martinez-Trevino* hearing on procedural default "would serve no purpose." *Id.* at 1738–39. Under those circumstances, federal courts also are prohibited from "hold[ing] an evidentiary hearing—or otherwise consider[ing] new evidence—to assess cause and prejudice under *Martinez.*" *Id.* at 1739.

When 28 U.S.C. § 2254(e)(2) bars consideration of new evidence, Rankin's only path forward is the statute's narrow exception. He first must show one of two things: that the claim relies on a new rule of constitutional law, which has been made retroactive to collateral review

9

cases by the Supreme Court, and was not previously unavailable; or that the claim relies on new facts that could not have been previously discovered with due diligence.   28 U.S.C. § 2254(e)(2)(A).   Whichever exception may apply, Rankin must then demonstrate that the facts supporting the claim are "sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."   28 U.S.C. § 2254(e)(2)(B).

**7.   Hearing Requests.**   Rankin makes an embedded request in the amended petition and supporting memorandum for an evidentiary hearing on three points:   (1) he is actually innocent of capital murder, (2) procedural default of ineffectiveness-of-trial-counsel claims is excused under the *Martinez-Trevino* equitable exception, and (3) he is intellectually disabled and therefore ineligible for the death penalty.[4]   Under then-existing circuit precedent, this Court granted an evidentiary hearing on several of the procedurally defaulted ineffectiveness-of-trial-counsel claims.   *Doc. No. 176.*   After the United States Supreme Court's decision in *Shinn* foreclosed record expansion under the potentially meritorious standard, the Court vacated the hearing order. *Doc. No. 183.*

Supplemental briefing based on *Shinn* would not be helpful.   With procedurally defaulted ineffectiveness-of-trial-counsel claims, Rankin cannot clear 28 U.S.C. § 2254(e)(2)'s high hurdle. As outlined at page 13, an intellectual-disability hearing is not warranted either.   These hearing requests are denied.   The Court will address the actual-innocence argument after resolving the other claims and procedural defenses.   *Dretke v. Haley*, 541 U.S. 386, 393–94 (2004).

---

[4] To the extent Rankin requests an evidentiary hearing on other claims, his request is denied.   With procedurally defaulted claims, either 28 U.S.C. § 2254(e)(2) bars an evidentiary hearing or the Court can evaluate those claims without a hearing.   Review of exhausted claims under § 2254(d) is limited to the record before the state court.   *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011).

**8. Claims For Relief.**  Appendix A lists Rankin's twenty-five claims for relief.  Rankin has not developed any argument to support Claim 13.  He has withdrawn Claims 15, 16, and 17; and he has admitted Claims 19 and 20 are not ripe for review.  In Claim 23, Rankin's general allegation of his state-court lawyers' ineffectiveness is not stated with sufficient specificity for *habeas* review.  Claims 13, 15, 16, 17, 19, 20, and 23 are denied.

Claims 24 and 25 can be decided under existing precedent.  "There is no constitutional right to an attorney in state post-conviction proceedings." *Coleman,* 501 U.S. at 752.  *Habeas* relief is not available based on cumulative error.  *Scott v. Jones*, 915 F.2d 1188, 1191 (8th Cir. 1990).  Claims 24 and 25 are denied.

Of the remaining claims, Claims 3, 6, 7, 8, 9, 10, 11, 18, 21, and 22 are procedurally defaulted.  The same is true for parts of Claims 4 and 14.  Rankin argues procedural default is overcome based on actual innocence.  He contends procedural default of ineffectiveness-of-trial-counsel claims is excused under a *Martinez-Trevino* analysis.  Claim 5, and the remainder of Claims 4 and 14, are exhausted.  The parties spar over whether Claim 12 is procedurally defaulted, so merits review is the more efficient approach.  The Court will unwind the procedural-default tangle of Claim 2.  And the Court will consider the actual-innocence argument in Claim 1, after considering the other claims and excuses for procedural default.  *Dretke,* 541 U.S. at 393–94.

**9. Intellectual Disability.**  Rankin contends that he is intellectually disabled and therefore ineligible for the death penalty under the Eighth Amendment.  He argues the constitutional challenge was unavailable at trial and is raised for the first time.  He says *de novo* review therefore is required.  This is Claim 2.

A preliminary issue is whether the intellectual-disability claim was exhausted in state court when adjudicated pursuant to the Arkansas intellectual-disability statute.  Before trial, Rankin

argued he was intellectually disabled at the time of the murders and therefore ineligible for the death penalty under state law.

(a)(1)   As used in this section, "mental retardation" means:

(A)   Significantly subaverage general intellectual functioning accompanied by a significant deficit or impairment in adaptive functioning manifest in the developmental period, but no later than age eighteen (18) years of age; and

(B)   Deficits in adaptive behavior; and

(2) There is a rebuttable presumption of mental retardation when a defendant has an intelligence quotient (I.Q.) of sixty-five (65) or below.

(b)   No defendant with mental retardation at the time of committing capital murder shall be sentenced to death.

Ark. Code Ann. § 5-4-618(a)–(b) (Repl. 1993).[5]

Following a hearing, the trial court found Rankin was not intellectually disabled.  The Arkansas Supreme Court affirmed.  *Rankin I*, 329 Ark. at 389–93, 948 S.W.3d at 402–04.  Five years later, the United States Supreme Court held in *Atkins v. Virginia* that the Eighth Amendment prohibited execution of persons with an intellectual disability.  536 U.S. 304 (2002).  The Supreme Court tasked states with "developing appropriate ways" to determine when capital defendants are "so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus."  *Id.* at 317 (quotations omitted).

The circuit has considered the appropriate *habeas* review of an *Atkins* claim, when the petitioner's conviction and sentence predated *Atkins,* and the petitioner did not raise an available statutory intellectual-disability defense under state law.  *Sasser v. Norris*, 553 F.3d 1121, 1124–125 (8th Cir. 2009), *abrogated on other grounds by Wood v. Millyard*, 566 U.S. 463 (2012);

---

[5] There are no substantive changes in the current version of the intellectual-disability statute,  Ark. Code Ann. § 5-4-618(a)–(b) (2019).

*Simpson v. Norris*, 490 F.3d 1029, 1034–1036 (8th Cir. 2007); *Jackson v. Norris*, 256 Fed. Appx. 12 (8th Cir. 2007) (*per curiam*). The circuit reasoned *Atkins* "created a new federal constitutional right, and this right was separate and distinct from any preexisting Arkansas statutory right." *Sasser*, 735 F.3d at 838 (quotations omitted). The petitioner therefore raised a "previously unavailable federal claim" that could not have been procedurally defaulted in state court. *Simpson*, 490 F.3d at 1035. Rankin's statutory intellectual-disability argument was exhausted in state court. But this Court finds no room to distinguish his *Atkins* claim from the separate-and-distinct *Atkins* claims considered by the circuit. The *Atkins* claim is not procedurally defaulted. Nor was it exhausted in state court.

The circuit also held that, because an *Atkins* claim is distinct from the state statutory claim, 28 U.S.C. § 2254(e)(2) does not bar an evidentiary hearing. *Simpson,* 490 F.3d at 1035. The evidentiary restriction applies when the petitioner "'failed to develop the factual basis of [his] claim in State court.'" *Id.* (quoting 28 U.S.C. § 2254(e)(2)). Rankin, however, "receiv[ed] a full and fair evidentiary hearing in [] state court." *Townsend v. Sain,* 372 U.S. 293, 312 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes,* 504 U.S. 1, 5–6 (1992). He developed the factual basis of the intellectual-disability claim. The Arkansas Supreme Court then considered if Rankin was intellectually disabled, as defined in the state statute. This Court is required to apply the same statutory definition to the *Atkins* claim. 536 U.S. at 317. An evidentiary hearing therefore is not warranted.

This Court considers the legal standard applicable to the *Atkins* claim under *de novo* review. The parties do not dispute the appropriate standard is the state statutory definition of intellectual disability, Ark. Code Ann. § 5-4-618(a)–(b). But Rankin argues Arkansas courts, at the time of his trial and direct appeal, were erroneously applying the state statute. He says Arkansas courts

required an IQ test score of 70 or less for an intellectual-disability finding.  He says the United States Supreme Court, in *Atkins,* recognized an intellectual-disability finding can be supported by an IQ score between 70 and 75, and significant deficits in adaptive behavior.

*Atkins* "gave no comprehensive definition of 'mental retardation' for Eighth Amendment purposes."[6]  *Shoop v. Hill,* 586 U.S. __, 139 S. Ct. 504, 507 (2019) (*per curiam*).  The Arkansas Supreme Court, moreover, did not use a strict cut-off score in *Rankin I.*  The Court specifically recognized the statutory definition of intellectual disability "encompasses more than an IQ score." *Rankin I,* 329 Ark. at 389, 948 S.W.2d at 402.  The Court also considered hearing testimony that a margin of error exists with IQ test scores, and findings related to Rankin's adaptive functioning. *Rankin I,* 329 Ark. at 391–92, 948 S.W.3d at 403–04.

Whether Rankin is intellectually disabled under the Arkansas statute is a question of fact. *Sasser*, 735 F.3d at 842.  The factual issue decided by the Arkansas Supreme Court is presumed correct, and Rankin carries the burden of rebutting the presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Gringas v. Weber*, 543 F.3d 1001, 1003 (8th Cir. 2008).

Early on, the trial lawyers requested an evaluation of Rankin's mental capacity and competency.  The trial court ordered an evaluation at Southeast Arkansas Mental Health Clinic (SAMHC).  Dr. William James, a psychiatrist, and David Nanuk, a licensed psychological examiner, evaluated Rankin in February 1995.  In his report, Dr. James listed three diagnostic impressions:  "(1) No Evident Psychosis (2) Antisocial Personality Disorder by history (3) Mental Retardation, mild."  Trial Record 1705.

---

[6] Twelve years after *Atkins,* the United States Supreme Court held unconstitutional a state law requiring an IQ score of 70 or less for an intellectual-disability finding.  *Hall v. Florida,* 134 S. Ct. 1986, 1998 (2014).  The Supreme Court again addressed analysis of intellectual-disability claims in *Moore v. Texas,* 581 U.S. __, 137 S. Ct. 1039 (2017).

The trial lawyers argued a second mental evaluation was necessary to determine if mental disease or defect was a viable defense.  They sought funds to retain Dr. Philip Murphy, a neuropsychologist, to evaluate Rankin for "psychological deficiencies."  Trial Record 329.  The trial court granted the motion, and Dr. Murphy assessed Rankin in September 1995.  As part of the neuropsychological evaluation, Dr. Murphy administered the Wechsler Adult Intelligence Scale–Revised (WAIS-R).  He reported Rankin was, "[i]ntellectually[,] a mildly to borderline mentally retarded individual . . .."  *Id.*  Dr. Murphy diagnosed Rankin with "Psychotic Mood Disorder, possibly of a Bipolar type [and] Post Traumatic Stress Disorder."  Trial Record 423.  He concluded that, at the time of the murders, Rankin "most likely" had a mental disease or defect rendering him "legally insane."  Trial Record 423.

Due to intellectual-disability references in the evaluation reports, the trial court granted an intellectual-disability hearing.  The trial court also ordered a neuropsychological evaluation at the State Hospital to assist the prosecutor with analyzing Dr. Murphy's report.  Rankin refused to participate in the assessment attempted by John Anderson, the State Hospital psychologist.

Prior to the intellectual-disability hearing, Rankin's lead trial lawyer, Gene McKissic, met with Nanak, and presumably Dr. James, to review their findings.  McKissic planned to call both as witnesses.  On direct examination, Nanuk testified that he considered Rankin's test scores and interview in assessing his level of functioning.  He said that, on the WAIS–R that he administered, Rankin's IQ score was 66, with a standard error of measurement of 2.94 points.  Nanak stated the 66 IQ score fell in the mild range of intellectual disability.  He stated that, on the Wide Range Achievement Test (WRAT), Rankin tested at a fourth-grade level in reading and at a fifth-grade level in math.  When McKissic pressed Nanak about the validity of his testing, Nanak testified that the testing was "as accurate as the information" that Rankin provided.  Trial Record 510.

On cross-examination, Nanak explained the mild intellectual-disability finding was "based strictly on the numbers obtained through the intellectual testing.  It is not a diagnosis.  That was the classification he tested into."  Trial Record 517.  Nanak said that he used the clinical interview to assess Rankin's other skills:  how Rankin communicated, whether he was able to understand what he heard and respond in a coherent manner, whether he was able to take care of himself and manage things, and whether he cared about his social appearance.  Nanak agreed Rankin was "able to do the general things required to get by in life."  Trial Record 529.  He said that he considered Rankin's total life functioning:  the ability to get along with other people, function within a group, sustain relationships, and take care of himself and his personal needs.  Nanak testified those skills must be considered along with Rankin's IQ score.

Nanuk also reviewed the test results from Dr. Murphy's assessment.  On the WAIS-R administered by Dr. Murphy, Rankin's IQ score was 72.  Nanuk testified the 72 IQ score was "probably" a "closer estimate" than the 66 IQ score of Rankin's "actual functioning level."  Trial Record 520.  He based his opinion on Rankin's consistently higher level of functioning across Dr. Murphy's more extensive testing.  He also said Rankin's standardized test scores in his school records were not consistent with intellectual disability and were more consistent with Dr. Murphy's test results.

Nanak testified that, because of Rankin's differing circumstances at testing, he was not "totally surprised" by the six-point increase in the IQ score.  Trial Record 519.  Nanak noted that he tested Rankin shortly after he was incarcerated.  He said Dr. Murphy tested Rankin six months later, after he adjusted to being confined in jail, with a presumably lower anxiety level.  Nanak also believed Rankin may not have given his best effort during the SAMHC evaluation.  He did not attribute the score increase to practice effect—residual knowledge from previous testing.  He

said any effect would account only for a one to two-point increase. He also said Rankin scored higher on a part of the WAIS-R administered by Dr. Murphy that would not have been affected by familiarity with the test. After considering Dr. Murphy's evaluation, Nanak's clinical impression was that Rankin was "probably borderline intelligent." Trial Record 534.

The next witness was Barbara Hubanks, Rankin's junior high math lab teacher for two years. On direct examination, Hubanks testified Rankin did not finish the eighth grade. She said Rankin came to math lab because he was performing behind grade level, and she testified about his improvement each year. On cross-examination, Hubanks explained that, if Rankin had been functioning below math-lab level, he would have been assigned to special education. She said that, as far as she could tell, Rankin was able to function in peer groups, get by day-to-day, have friends, and take care of his personal needs.

The third witness was Dr. Anderson, the State Hospital psychologist. He testified that Rankin refused to participate in a formal assessment. He said that, when he reached out to Rankin's family members, they did not answer his telephone calls. On cross-examination, Dr. Anderson testified that Dr. Murphy's testing was a reasonable assessment of Rankin's intellectual functioning level. He also addressed practice effect. He said that an increase in performance on intelligence tests would not be unusual, but that studies indicate there is very little practice effect beyond six months. He admitted there was possibly some effect on Rankin's testing. But he said Rankin's test results were not "particularly elevated" on sub-tests most influenced by practice effect. Trial Record 546.

The trial court also considered the evaluation reports prepared by Nanak and Dr. James. The defense did not call Dr. James as a witness, informing the trial court that his testimony would be cumulative. The trial lawyers also chose not to call Dr. Murphy as a witness or introduce his

report at the hearing.  The trial court noted that, because Dr. Murphy's report was already in the record, it would be considered.  Rankin provided some background information in the evaluation reports.  He repeated the eighth grade several times and did not continue to the ninth grade.  He reported some work history, including a summer job when he was sixteen.  He sometimes lived with his mother, and, at other times, with his grandmother.  He did not have a driver's license, but had planned to get one.

The trial court found that, based on hearing testimony and evaluation reports, Rankin had not demonstrated an intellectual disability.  On appeal, the Arkansas Supreme Court considered Nanak's assessment of Rankin's functioning levels, his endorsement of the 72 IQ score, and his conclusion that Rankin was "borderline intelligent rather than mildly mentally retarded."  *Rankin I,* 329 Ark. at 389–93, 948 S.W.3d at 402–04.  The Supreme Court also reviewed the testimony from Nanak and Dr. Anderson explaining the six-point increase in the IQ score.  *Id.*  Affirming the trial court, the Arkansas Supreme Court held there was substantial evidence that Rankin did not have an intellectual disability.  *Id.*

Rankin argues the hearing record does not support the Arkansas Supreme Court's decision.  He says the prosecutor did not disclose available information that practice effect influenced the 72 IQ score.  He says the trial lawyers' lack of effort prevented development of a convincing record.  As addressed at pages 40 through 41, the prosecutor did not commit constitutional error.  And Rankin does not develop his point that the trial lawyers' work was affected by ambivalence toward the intellectual-disability issue.

Rankin also argues the Arkansas Supreme Court erred in crediting the 72 IQ score over the 66 IQ score.  He says the Supreme Court failed to recognize practice effect explained his higher IQ score on Dr. Murphy's testing.  He also says that both IQ scores should have been adjusted

downward four points for norm obsolescence ("Flynn Effect"), and that another one point should have been subtracted from the 72 IQ score based on a purported scoring error.  There was hearing testimony, however, that the 72 IQ score was not likely affected by practice effect, and that Dr. Murphy's assessment was reasonable.  The United States Supreme Court, moreover, recently described the "so-called Flynn Effect" as "a controversial theory involving inflation of IQ scores over time." *Dunn v. Reeves,* 594 U.S. __, 141 S. Ct. 2405, 2408–09 (2021).

Rankin also urges this Court to consider papers proffered in the state-court Appendix. Evidence supporting a motion to recall the mandate is not available for *habeas* review.  *Wooten v. Norris,* 578 F.3d 767, 782–86 (8th Cir. 2009).  Rankin also relied on these papers to support his *coram-nobis* point that he was incompetent at trial due to intellectual disability and mental illness. Because *coram-nobis* review is part of the state court's appellate review process, *Carter,* 2016 Ark. 448, *2, the record supporting a properly raised motion is available for this Court's consideration.  The statutory intellectual-disability claim, however, was litigated and settled on direct appeal.  *Rankin I,* 329 Ark. at 389–93, 948 S.W.3d at 402–04.  Arkansas courts do not distinguish statutory intellectual-disability claims from those raised under *Atkins*.  *Engram v. State,* 360 Ark. 140, 148 & n.1 (2004).  And, as addressed at pages 27 through 30, Rankin's competency claim was procedurally defaulted when he abandoned it on direct appeal.  The available state-court record is complete without these papers.  Record expansion is barred by 28 U.S.C. § 2254(e)(2).

This Court must consider the *Atkins* claim under the Arkansas statutory definition of intellectual disability.  *Atkins*, 536 U.S. at 317; *Sasser,* 735 F.3d at 842.  Rankin has not overcome the presumption that the Arkansas Supreme Court's factual findings are correct.  28 U.S.C. § 2254(e)(1); *Gringas*, 543 F.3d at 1003.  He does not point to clear and convincing evidence contradicting the state-court determination that he is not intellectually disabled, as defined in Ark.

Code Ann. § 5-4-618(a).  If the Court has misapplied circuit precedent so that the *Atkins* claim was exhausted in state court, the outcome is the same.  The claim fails under 28 U.S.C. § 2254(d) deference review.  Claim 2 is denied.

**10. Suppression Of Statement.**  In Claim 4, Rankin argues the trial court's denial of the motion to suppress his statement was a violation of the Fifth Amendment.  He contends that his waiver of the right against self-incrimination was not knowing and intelligent, and that his statement was not voluntary.  This part of the claim is exhausted.  Rankin also says investigators' failure to record the entire interrogation was a constitutional violation.  This part is procedurally defaulted.  The related ineffectiveness-of-trial-counsel claim is also procedurally defaulted.

At the suppression hearing, investigators testified about Rankin's interrogation at the Pine Bluff police station:  Shortly after 8 a.m., Pine Bluff officers arrested Rankin and transported him to a holding cell at the police station.  At 10:43 a.m., Detective James Cooper presented Rankin with a *Miranda* waiver form titled "Rights Form."  Sergeant Arless Hudgins also was present.  The *Miranda* waiver was placed where Rankin could read it, and Cooper read each right aloud.  After each right was read, Rankin was asked, "Do you understand?  Yes or no."  Rankin replied "yes" to each question and initialed each right.  He then signed his name at the bottom of the completed form.  Rankin appeared to understand his rights, and Cooper had no problems communicating with him.

Rankin told a different story.  He testified that he could not read the *Miranda* waiver, and that Cooper did not read it to him.  He said Cooper gave him a piece of paper and told him to sign it, saying it was "just simple police procedure."  Suppression Hearing Record 193.  He said he did not understand that he was waiving any rights.

After the *Miranda* waiver was executed, Detective Cooper told Rankin that he was accused of the murders, and that investigators were aware he had threatened Sonyae and her family. Rankin repeatedly denied any involvement in the crimes. During a twenty-minute lunch break, detectives gave Rankin a cheeseburger and drink. When Cooper returned, he accused Rankin of lying. He told Rankin that officers found his jacket and shoes. He asked Rankin if he wanted some time alone, and Rankin said he did. Before Cooper walked out, a note stating the murder weapon had been found was slid under the door. Cooper left the room without informing Rankin of this development. When Cooper and another officer returned, they showed the pistol to Rankin. He responded, "[Y]ou don't have to show me because I'm going to talk to you." Suppression Hearing Record 73. According to Cooper, Rankin's demeanor changed—from calm and quiet to upset and crying—when he saw the pistol.

Rankin testified investigators refused his requests to use the telephone and for a lawyer. He said Detective Cooper told him that, if he did not talk, officers were going to arrest Rodney. He said Cooper told him that his mother and Rodney were at the police station, and that nobody was going anywhere until Rankin told him what he wanted to know. Cooper disputed Rankin's version. He testified there were no threats, promises, or conditions prior to the statement. He did not remember Rankin asking to make a phone call. He said Rankin did not ask to have a lawyer present. Cooper said he was not aware until after he questioned Rankin that his brother and mother were at the police station. He said there was no discussion about either being involved in the shootings. He did not remember Rankin wanting to talk to them until he asked to talk to his mother after giving his statement.

Rankin gave an audio-recorded seven-minute statement at 1:20 p.m. He remained upset and crying. He answered Detective Cooper's questions about his rights, saying that he

21

remembered signing the *Miranda* waiver, that he understood his rights, and that he had not been mistreated.   He then confessed, answering "yes" to Cooper's questions about the murder circumstances.  He said he shot Zena and the Halfords.  He said that he and Sonyae had relationship problems, and that her mother did not want them to be together.  After his statement, Rankin asked to see his mother.  Cooper allowed the two to visit in his office.  Rankin then was transported to the Jefferson County jail.

Detective Cooper began the second interview at 4:18 p.m.  He went through the same procedure with the *Miranda* waiver, and Rankin signed a second form.  Cooper described Rankin as "kind of irritated."  Suppression Hearing Record 85.  After four minutes, Rankin ended the interview, turning off the tape recorder and saying that he did not want to talk anymore.

Nanak and Dr. Anderson testified at the suppression hearing about Rankin's capacity to understand the *Miranda* waiver.  Nanak said Rankin was capable of understanding his rights and making a decision to waive those rights.  He admitted that he could not get inside Rankin's mind to give a definite answer on whether Rankin understood that he was waiving his rights when he signed the *Miranda* waiver.  But he said that there was "not much of an issue," and that Rankin should be able to understand that he was waiving his rights by signing the form.  Suppression Hearing Record 151.  Dr. Anderson also testified Rankin had the capacity to understand the statements and questions on the waiver form.  He said Rankin did not have a mental deficiency impairing his capacity to understand the consequences of waiving his rights.

The trial court denied the suppression motion, finding Rankin made the custodial statements after making a knowing and intelligent waiver of his right against self-incrimination.  The trial court also found Rankin's statements were voluntary.  The Arkansas Supreme Court

affirmed.  *Rankin II,* 338 Ark. at 728–733, 1 S.W.3d at 17–20.  *Habeas* review of the exhausted

claim is limited to the state-court record.  *Pinholster*, 563 U.S. at 181–82.

The Arkansas Supreme Court's decision was not contrary to, or an unreasonable

application of, clearly established federal law; or an unreasonable determination of the facts.  28

U.S.C. § 2254(d).  The voluntariness test is if, under the totality of the circumstances, the

defendant's "will has been overborne and his capacity for self-determination critically impaired."

*Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).  Circumstances may include the degree of

police coercion, the length of the interrogation, its location, its continuity, and the defendant's

maturity, education, physical condition, and mental condition.  *Withrow v. Williams*, 507 U.S. 680,

693 (1993).  "[C]oercive police activity is a necessary predicate to the finding that a confession is

not voluntary."  *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  "A defendant's mental condition

cannot render his confession involuntary unless it coincides with improper conduct by the police."

*Smith v. Bowersox*, 311 F.3d 915, 922 (8th Cir. 2002).  And "it is a rare case when a defendant can

make a colorable argument that a self-incriminating statement was compelled despite the fact that

law enforcement authorities adhered to the dictates of *Miranda*."  *Williams v. Norris*, 576 F.3d

850, 868 (8th Cir. 2009) (quotations omitted).

The Arkansas Supreme Court was not unreasonable in rejecting Rankin's testimony that

he was threatened—his brother and mother would be held until he gave an incriminating statement.

Nor was the Supreme Court unreasonable in its alternative holding:  Even if Rankin's testimony

is accepted as true, police threats did not render his statements involuntary.  Instead, Rankin

decided to confess immediately after investigators showed him the recovered murder weapon.

*Rankin II*, 338 Ark. at 728–29, 1 S.W.3d at 17–18.  The record supports the Supreme Court's

determination that neither the length nor the nature of Rankin's detention rendered his statements

involuntary.  Based on expert testimony, the Court was not unreasonable in holding Rankin's age and mental capacity did not demonstrate a lack of voluntariness either.  *Id.* at 729–31, 1 S.W.3d at 18.  Under deference review, the circumstances of the interrogation did not cause Rankin's will to be overborne.  Neither his age nor his intellectual level rendered his confession involuntary.  He was given *Miranda* warnings with no indication that he did not understand them.

The Arkansas Supreme Court also was not unreasonable in holding Rankin knowingly and intelligently waived his right against self-incrimination.  A waiver is knowing and intelligent when "it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  "The *Miranda* warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Colorado*, 479 U.S. at 574.  "The *Miranda* warnings ensure that a waiver of these rights is knowing and intelligent." *Id.*

The state-court record supports the Supreme Court's determination that investigators twice informed Rankin of his *Miranda* rights.  Rankin responded affirmatively that he understood each right, and he executed the *Miranda* waiver indicating that he was waiving his rights.  The record also supports the conclusion that, when Rankin turned off the tape recorder during the second interview and stated that he no longer wished to talk to the police, he "clearly indicated that he understood what his rights were, and he also knew how to invoke those rights."  *Rankin II*, 338 Ark. at 731–34, 1 S.W.3d at 18–21.  Both experts, moreover, testified Rankin had the intellectual capacity to understand his rights and the consequences of waiving them. Under deference review, neither Rankin's age nor his mental capacity prevented him from making a knowing and intelligent waiver.  This part of Claim 4 fails.

Rankin does not cite federal authority supporting his argument that failure to record the entire interrogation violates the Eighth and Fourteenth Amendments.  He instead relies on a state criminal procedure rule enacted after his police interview.  The rule states that, whenever practical, a jailhouse custodial interrogation should be electronically recorded.  Ark. R. Crim. P. 4.7 (2012).  Rankin also refers to the heightened need for reliability in death-penalty cases.   An inquiry into Arkansas law is "no part of a federal court's *habeas* review of a state conviction."  *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).  *Habeas* relief "does not lie for errors of state law."  *Id.* Procedural default is not excused.  Because Rankin has not articulated a claim cognizable on federal *habeas* review, this part of Claim 4 alternatively fails on the merits.  28 U.S.C. §  2254(b).

In a related ineffectiveness claim, Rankin contends his trial lawyer's work was constitutionally deficient in violation of the Sixth Amendment.  He was represented at trial by lead lawyer McKissic and Jesse Kearney.  McKissic continued to represent Rankin on direct appeal and on remand for the suppression hearing.  Rankin contends McKissic should have bolstered the suppression argument with additional experts.  He also generally says McKissic failed to adequately litigate the suppression argument because he did not request a suppression hearing before trial and later asked the trial court on remand to relieve him as counsel.  A *Martinez-Trevino* analysis applies to the procedurally defaulted claim.  Review is limited to the state-court record. 28 U.S.C. § 2254(e)(2); *Shinn*, 142 S. Ct. 1718.

Whether a procedurally defaulted ineffectiveness-of-trial-counsel claim is substantial under *Martinez-Trevino* is considered under the familiar *Strickland* standard:  Was the trial lawyer's performance constitutionally inadequate?  Is there a reasonable probability of actual prejudice?  *Strickland v. Washington,* 466 U.S. 688 (1984).  "Counsel was entitled to formulate a

strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter*, 562 U.S. 86, 107 (2011).

Dr. Anderson and Nanak testified Rankin had the capacity to understand his rights and to waive them. McKissic's focus on challenging the experts and questioning the interrogation circumstances was constitutionally adequate. "In many instances, cross-examination will be sufficient to expose defects in an expert's presentation." *Id.* at 111. McKissic pressed Nanak and Dr. Anderson on whether Rankin understood the consequences of waiving his rights. Nanak admitted that he could not be certain Rankin understood that he was waiving his rights when he signed the *Miranda* waiver. McKissic questioned Detective Cooper about the waiver form's lack of clarity. He sought to demonstrate that investigators, in order to gain an advantage over Rankin, intentionally isolated him from his family and kept him in the dark about being the murder suspect.

Under a *Martinez-Trevino* analysis, Rankin has not demonstrated a substantial ineffectiveness claim. *Martinez,* 566 U.S. at 14. Whether the trial lawyer's work was constitutionally effective would not be debated among reasonable jurists. *Dorsey v. Vandergriff*, 30 F.4th 752, 756–57 (8th Cir. 2022). Procedural default of the ineffectiveness claim is not excused. Claim 4 is denied.

**11. Competency To Stand Trial.** Rankin next contends his conviction must be set aside because he was unable to understand the trial proceedings against him or aid in his defense. He says the trial lawyers' work was constitutionally deficient in not seeking a competency determination. Rankin also repeats his argument that the prosecutor did not disclose available information about practice effect. Claim 9 is procedurally defaulted.

Before the intellectual-disability hearing, the parties conferred with the trial court off the record and agreed the hearing evidence—expert testimony and evaluation reports—would provide

an adequate basis to determine Rankin's competency stand trial.  In his report, Nanak concluded

Rankin "should be able to comprehend the functioning of a courtroom setting and be able to

actively participate in his own defense."  Trial Record 1703.  Dr. James also reported Rankin was

competent to stand trial.

> In my opinion, this young man, based on this psychiatric examination, has the
> capacity to understand the proceedings against him and to assist effectively in his
> own defense.  He does appear to appreciate the criminality of the alleged conduct,
> insisting repeatedly that he did not "kill anyone" and recognizes the wrongfulness
> of such behavior.   There are no indications of delusions or hallucinations
> contributing to such a wrongful act if the patient undertook the same, in my opinion.
> This is based on the coherent verbal responses with frequent "I don't knows"
> seemingly designed to deny knowledge or responsibility for the reported murders,
> nevertheless reflecting an appreciation of the culpability of a person responsible for
> such assaults.   For example, Mr. Rankin states that he does not know that if,
> hypothetically, he observed three people killed by someone, whether they should
> go to jail or themselves be executed, responding, "All I know is I didn't do it."

Trial Record 1706.  Dr. Anderson determined Rankin was malingering, and he found Rankin

understood the charges and proceedings against him.  He concluded that, if Rankin chose to do so,

he was capable of cooperating effectively with his trial lawyers.  Dr. Anderson repeated his

competency finding at the intellectual-disability hearing.  Dr. Murphy reported Rankin had

symptoms of a thought disorder, along with "various hallucinations, possible illusions and

primitive delusions."  Trial Record 423.  But he did not address whether Rankin's impairments

made him incompetent to stand trial.

   After the evaluation reports were introduced into evidence, or considered as part of the

existing record, the trial court found Rankin competent to stand trial.  Rankin did not challenge the

trial court's finding on direct appeal.  He now argues the competency claim was exhausted when

he sought *coram-nobis* relief based on an insanity claim.

   The Arkansas Supreme Court recognizes a writ of *error coram nobis* as a remedy for

insanity at the time of trial, when the petitioner demonstrates a "fundamental error of fact intrinsic

to the record." *Millsap v. State*, 2016 Ark. 391, *2–3 (*per curiam*).  The Supreme Court, however, has repeatedly dismissed *coram-nobis* petitions without reaching the merits when the sentencing court considered the petitioner's competency and entered an order finding him competent to proceed.  *Davis v. State*, 2017 Ark. 74, *4–5 (*per curiam*) (third petition); *Millsap,* 2016 Ark. 391, *3–5 (second petition); *Davis v. State*, 2016 Ark. 296, *4–5 (*per curiam*) (second petition); *Westerman v. State*, 2015 Ark. 69, *5; *Millsap*, 2014 Ark. 493, *3–4 (*per curiam*) (first petition). Rankin proffered new mental evaluations in the Appendix.  But, like these petitioners, he did not present facts extrinsic to the record "not known at the time of trial, or which could not have been known at the time of trial."  *Millsap,* 2016 Ark. 391, *3–5.

The presumption is overcome that the Arkansas Supreme Court's denial of the *coram-nobis* claim was on the merits.  *Harrington*, 562 U.S. at 99–100.  A more likely explanation for the Supreme Court's summary denial is that the trial court had already found Rankin was competent. This is not a case like *Newman v. State*, where the Arkansas Supreme Court reinvested jurisdiction in the circuit court to consider a *coram-nobis* petition because the trial court's competency finding was based on a subsequently discredited report by a State Hospital psychologist.  2009 Ark. 539, *6–13.  Based on this record, the competency claim was procedurally defaulted when Rankin abandoned the claim on direct appeal. *Weekley v. Jones,* 56 F.3d 889, 894–95 (8th Cir. 1995), *reasoning adopted in relevant part on rehearing en banc*, 76 F.3d 1459, 1461 (8th Cir. 1996) (*en banc*).  Rankin has not shown any excuse for the default.

The claim also fails under an alternative merits analysis.  28 U.S.C. § 2254(b).  Three examiners——Nanak, Dr. James, and Dr. Anderson—found Rankin competent to stand trial.  Dr. Murphy did not reach a conclusion.  Based on the trial record, Rankin's competency claim is without merit.

Rankin fares no better when mental evaluations proffered in the Appendix are considered. He relies on two examiners' attestation that the *habeas* petition accurately described their "doubts about his lack of legal competency." *Doc. No. 104-3 at 25.* Their evaluation reports, however, did not include findings on Rankin's competency to stand trial. There was no analysis of the effect of Rankin's intellectual deficits on his ability to understand a proceeding against him or to assist effectively in his own defense. A diagnosis of mild intellectual disability does not equate to a lack of competency to proceed at trial. "Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial." *Atkins,* 536 U.S. at 318.

In an affidavit proffered in the Appendix, McKissic attested Rankin "was not understanding us or grasping how a court case proceeds." *Doc. 104-3 at 35.* But a review of the record casts a different light. On the morning of the scheduled trial, McKissic informed the trial court that Rankin's "strong desire" was to change his plea from not guilty by reason of mental disease or defect to a general-denial defense. Trial Record 630. McKissic said that he had a "fine relationship" with Rankin, and he agreed with Rankin that he could "legitimately raise" a general-denial defense. Trial Record 629, 631. Rankin then amended his plea, and the trial date was continued. Rankin thereafter testified coherently in his defense and in support of the suppression motion.

Rankin also argues the trial lawyers' work was constitutionally deficient because they did not challenge his competency to stand trial. He again points to McKissic's proffered affidavit. He says the trial lawyers should have been alerted to his incompetency based on their observations and the pretrial mental evaluations. The SAMHC and the State Hospital examiners evaluated Rankin for competency. There was nothing in the reports to raise doubts about their findings. Rankin has not demonstrated the experts' conclusions would have been different with additional

time or more information.   The trial court considered this evidence before finding Rankin competent to proceed.   Under a *Martinez-Trevino* analysis, the ineffectiveness claim is not substantial. *Martinez,* 566 U.S. at 14.   Procedural default is not excused.   Claim 9 is denied.

**12.   Venue Change.**   Rankin next argues the trial court's denial of his motion to change venue was constitutional error.   He says a prejudicial atmosphere due to pretrial publicity prevented a fair trial in Jefferson County.   This is Claim 12.

The parties spar over whether Rankin exhausted state remedies by presenting his claim in state court.   To fairly present a claim, Rankin must " have alerted the [state] court to the alleged federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 33 (2004).   He must "refer to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue." *Barrett v. Acevedo*, 169 F.3d 1155, 1161–62 (8th Cir. 1999) (*en banc*).   If Rankin did not fairly present his federal claim in state court, the presumption of merits adjudication is rebutted and the claim is procedurally defaulted. *Johnson v. Williams,* 568 U.S. 289, 302 n.3 (2013).   Because Rankin cannot succeed on the merits, an alternative merits analysis is the more efficient approach. *Barrett*, 169 F.3d at 1162; 28 U.S.C. § 2254(b).

Citing state law, the Arkansas Supreme Court affirmed the trial court's denial of Rankin's venue motion. *Rankin I*, 329 Ark. at 394–97, 948 S.W.2d at 404–06.   The state-court record includes affidavits and hearing testimony from local residents:   The community was aware of the murders; the general opinion was Rankin was guilty; a local radio station aired an announcement— 27 times over two to three weeks—that provided the trial schedule and encouraged support for the victims' families; and the general manager of the radio station broadcast his reading of newspaper articles about the murder.   Rankin also introduced a newspaper article about his plea change.

30

The Supreme Court correctly  summarized *voir dire* on pretrial publicity:

At the outset of Mr. Rankin's trial, the Trial Court mentioned that there had been some press coverage of the case.  He asked the pool of potential jurors if they had independent knowledge of the case beyond the press accounts.  Some answered yes; many said they had not formed an opinion about Mr. Rankin's guilt or innocence and would not be biased.  Others mentioned that they would be biased, and they were excused.  Defense counsel specifically asked if anyone had heard radio-station announcements, and none responded affirmatively.  Many could not recall hearing any pre-trial publicity.  Those who could recall hearing press coverage stated that they had formed no opinions as to Mr. Rankin's guilt or innocence and could be fair and impartial and decide the case based on what was presented to them.  Then the judge asked what he called a "catch-all question":

> . . . [I]s there anything that any of you know about your situation, your mind set, or whatever, that would keep you from listening to the testimony and the evidence and making a decision at the conclusion of this case based only on what you hear in this courtroom in the way of evidence and the law as the Court would instruct you?

There was no response, and the Trial Court responded, "All right."

*Id.* at 395–96, 948 S.W.2d at 405–06.

In considering whether an impartial jury was seated, federal courts ask two questions:  Was pretrial publicity so extreme that prejudice can be presumed?  Based on a review of the record, did actual prejudice infect the jury?  *Skilling v. United States*, 561 U.S. 358, 377 (2010).  This is not one of those rare cases where pretrial publicity was so "extensive and corrupting" that prejudice of "constitutional magnitude" must be presumed.  *United States v. Contreras,* 816 F.3d 502, 510 (8th Cir. 2016).  There was not a televised confession amounting to "kangaroo court proceedings." *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963).  A "carnival atmosphere" didn't pervade the trial. *Sheppard v. Maxwell,* 384 U.S. 333, 358 (1966).  Nor has Rankin shown pretrial publicity infected the seated jury with actual prejudice.  He has not identified any seated juror's *voir dire* testimony demonstrating actual prejudice.  *Contreras*, 816 F.3d at 510.  The jury selection process was sufficient to secure unbiased jurors.  On merits review, Claim 12 is denied.

**13. *Batson* Challenge.** Rankin argues his constitutional rights were violated when the prosecutor used peremptory strikes to reduce the number of Black jurors.[7] He contends the prosecutor's offered explanations for the strikes were pretextual, and the trial court improperly applied the three-step framework in *Batson v. Kentucky,* 476 U.S. 79, 96–98 (1986). Procedural default occurred when Rankin did not appeal the trial court's denial of relief. Rankin's related claim challenging his appellate lawyer's work is also procedurally defaulted. This is Claim 10.

To prove a *Batson* violation, the trial court must first determine if the defendant made a *prima facie* showing the prosecutor's peremptory challenge was racially motivated. 476 U.S. at 96–97. If that demonstration is made, the burden shifts to the prosecutor to present a race-neutral explanation for the strike. *Id.* at 97–98. The defendant ultimately bears the burden of establishing the prosecutor engaged in purposeful discrimination. *Id.* at 98.

Before the jury was sworn, Rankin argued the prosecutor's strikes of three Black women— Barbara Grinage, Jesse Hall, and Linda Murray—were racially motivated. The list initially included Delois Marks, a Black woman. But the trial court summarily rejected the Marks challenge: "Now I can short circuit that real quick. She didn't want any part of the responsibility of being a juror and there was ample reason for striking her." Trial Record 967. Rankin thereafter abandoned the *Batson* challenge as to Marks. He also challenged the prosecutor's peremptory strike of a potential alternate juror, Elmer Bankston, a Black man.

Addressing Rankin's challenges, the trial court summarized jury selection, listing the race of each juror seated, or struck by the prosecutor. The trial court then asked the prosecutor to provide a race-neutral reason for striking Grinage and Hall. The prosecutor said he used eight peremptory strikes—three on White potential jurors and five on Black potential jurors. He said he

---

[7] Rankin also refers to gender discrimination in jury selection. He fails to develop the argument sufficiently for *habeas* review.

was "not comfortable" with Grinage's responses to questions about ongoing State Police investigations of her co-workers at the Department of Human Services; he was concerned about "some bias." Trial Record 970. He said there was concern about Hall being biased against the State due to a drug-possession charge listed on her juror questionnaire. And he said Bankston also had a prior criminal charge that could cause bias. Although the trial court did not require a reason for striking Murray, the prosecutor offered an explanation: As a phlebotomist, Murray's background was "in blood and examination of blood," so she might use her knowledge during deliberations instead of following the trial court's instructions. Trial Record 971. The trial court found the prosecutor's reasons were racially neutral, and denied the *Batson* challenges. Rankin did not appeal that finding. Nine White and three Black jurors served on the jury.

Based on this record, the prosecutor presented adequate race-neutral explanations for each peremptory strike. Grinage stated that the DHS investigation did not affect her view of the criminal-justice system, and that she only knew about it through rumors and news reports. But she acknowledged being acquainted with some of the investigated employees. She also recognized two individuals connected to the case. Rankin notes for the first time that Hall's questionnaire response was that she had been the *victim* of a drug-possession crime. A "series of factually inaccurate explanations" for striking Black potential jurors must be considered in assessing the prosecutor's intent. *Flowers v. Mississippi*, 588 U.S. __, 139 S. Ct. 2228, 2250–251 (2019). But there is no pattern of misstatements in this case to suggest intentional discrimination. *Id.* The prosecutor's misstep appears to be the result of the "back and forth" of a "hurried" *Batson* hearing. *Id.* There was a facially valid reason for striking Murray based on her profession. The significance of blood stains from an unknown source was a potential trial issue. Marks expressed reservations about voting for the death penalty. Bankston did not acknowledge any prior charges or

convictions, but the prosecutor's office presumably had that information.  And the circuit has not decided if *Batson* applies to potential alternative jurors when, as in this case, no alternative juror served.  *Carter v. Kemna*, 255 F.3d 589, 592 (8th Cir. 2001).

Rankin also makes three new arguments.  First, he contends the prosecutor's explanation— based on Murray's work as a phlebotomist—was inconsistent with the acceptance of two similarly-situated White jurors:  a registered nurse employed by a hospice agency, and a retired teacher with bachelor's degree in health and minor in biology.  A prosecutor's decision not to strike a similarly situated non-Black juror is "evidence tending to prove purposeful discrimination."  *Miller-El v. Dretke,* 545 U.S. 231, 241 (2005).   But Rankin has not demonstrated these jurors were similarly situated to Murray.  It is not apparent from the seated jurors' employment that they regularly drew blood for analysis, as Murray did.  Second, relying on affidavits from McKissic and Kearney proffered in the Appendix, Rankin says the Jefferson County prosecutor's office had a pattern and practice of removing Black potential jurors.  These affidavits are not available for this Court's review.  *Wooten,* 578 F.3d at 782–86.  In any event, the trial lawyers' attestations are not like the "historical evidence" available in *Flowers,* 139 S. Ct. at 2244–45, or the jury-selection manual distributed to prosecutors in *Miller-El,* 537 U.S. at 264–66.  Third, Rankin argues the trial court misapplied the *Batson* framework.  He says the court found the prosecutor offered race-neutral reasons for the strikes, but then failed to take the next step of considering purposeful discrimination under all circumstances.  The Court of Appeals rejected this argument in *Smulls v. Roper*: "[F]ederal law has never required explicit fact-findings following a *Batson* challenge, especially where a *prima facie* case is acknowledged and the prosecution presents specific nondiscriminatory reasons on the record."  535 F.3d 853, 860 (8th Cir. 2008).  "A trial court's ruling on a *Batson*

challenge is itself a factual determination, and [the Eighth Circuit has] repeatedly upheld rulings made without additional reasoning." *Id.*

Procedural default is not excused.  The *Batson* claim also fails under an alternative merits analysis.  28 U.S.C. § 2254(b).  Rankin has not demonstrated the prosecutor's strikes were based on purposeful discrimination.  For the same reasons, the related ineffectiveness-of-appellate-counsel claim fails under an alternative merits analysis.  *Id.*  Rankin cannot show either deficient performance or actual prejudice based on the appellate lawyer's work.  Claim 10 is denied.

**14. Evidence Suppression.**  Rankin argues the prosecutor failed to disclose four pieces of evidence:  (1) the manipulation of Sonyae Reynolds, (2) the complete police investigation file, (3) other burglaries of the Demmings house, and (4) evidence that Rankin's 72 IQ score was affected by practice effect.  Rankin says the prosecutor's actions are due-process violations under *Brady v. Maryland*, 373 U.S. 83 (1963), or *Giglio v. United States*, 405 U.S. 150 (1972) and *Napue v. Illinois*, 360 U.S. 264 (1959).  This is Claim 5.

Rankin raised the claim for the first time in the original *habeas* petition.  After this Court stayed the *habeas* case, Rankin sought *coram-nobis* review.  In the Appendix, Rankin included seven relevant papers:  (1) Affidavit of Gene McKissic, referring to a note on practice effect in the prosecutor's file, *Doc. 104-3 at 30;* (2) Declaration of Sonyae Reynolds, *Doc. 104-4 at 31;* (3) Detective Bureau Summary, detailing the police investigation of the murders, *Doc. 104-5 at 16;* (4) Declaration of Ernest Demmings, burglary victim, *Doc. 104-5 at 29;* (5) Declaration of Kitty Hailey, Rankin's *habeas* investigator, *Doc. 104-5 at 30;* (6) Declaration of Rebecca Blaskey, Rankin's *habeas* lawyer, *Doc. 104-5 at 34;* and (7) Transcript of Sonyae Reynolds Interview, *Doc. 104-5 at 35*.  Since returning to federal court, Rankin has proffered a handwritten note from the prosecutor's file about a conversation with an expert on practice effect.  *No. 147-1 at 3.*

35

The Arkansas Supreme Court recognizes a writ of *error coram nobis* as the remedy when material evidence is withheld by the prosecutor. *Carter*, 2016 Ark. 448, *2–3. The Supreme Court permits a petitioner to proceed in the trial court with a petition for writ of *error coram nobis* when the proposed attack on the judgment appears meritorious. *Flanagan v. State*, 2010 Ark. 140, *1 (*per curiam*). The Court considers "the reasonableness of the allegations" and "the existence of the probability of the truth." *Id.* Rankin fairly presented the *habeas* claim in seeking *coram-nobis* relief. The Arkansas Supreme Court denied Rankin's motion in a one-sentence summary order. *Doc. 105-1; Rankin*, No. CR-96-1025. The presumption is not overcome that the Supreme Court's denial was on the merits. There is no "reason to think some other explanation for the state court's decision is more likely." *Harrington,* 562 U.S. at 99–100.

Deference review is appropriate under 28 U.S.C. § 2254(d). This Court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent'" with a prior United States Supreme Court holding. *Id.* at 102. Review is limited to the facts before the state court. *Pinholster*, 563 U.S. at 181–82.

To establish a *Brady* violation, Rankin must satisfy its three parts: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). The prejudice inquiry is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). This Court must consider the allegedly suppressed evidence collectively. *Id.* at 436–37. Rankin is not required to demonstrate that "he more likely than not would have been acquitted had the new

evidence been admitted." *Wearry v. Cain,* 577 U.S. 385, 392 (2016) (*per curiam*) (quotations omitted). A *Napue-Giglio* violation requires a demonstration that the prosecution knowingly presented, or failed to correct, false evidence. *Giglio,* 405 U.S. at 153; *Napue,* 360 U.S. at 269.

Rankin first argues Sonyae identified the jacket and shoes worn by the intruder as belonging to him, only after the prosecutor convinced her that he was the killer. According to Sonyae, the prosecutor told her three things: (1) Rankin admitted to McKissic that he pointed the gun at his nephew but then stopped himself from killing the child; (2) the investigating officers "found the clothes behind the dresser and the gun in the woods," and "the evidence all matched up with what [she] said"; and (3) based on a mental evaluation, Rankin was not "crazy." *Doc. 104-4 at 31.*

Rankin says that, prior to being manipulated, Sonyae gave a description of the intruder that matched his brother, Rodney—who is shorter than Rankin. Sonyae told the 911 operator that she could not identify the intruder. She told Detective Cooper that the intruder was too short to be Rankin. She said that she saw the intruder was wearing Dickie pants and a black jacket with gray stripes and writing on the back, but she did not see his shoes.

Sonyae testified during the guilt phase that she "knew" the intruder was Rankin because she recognized his Starter jacket and Reebok shoes. Trial Record 1050. She remembered the intruder was wearing jeans. On cross-examination, Sonyae testified the 911 operator would not have known Rankin, and she did not want to have a conversation. She said that she was only interested in the ambulance getting to the apartment, and that she was afraid Rankin was still there. She said that she was nervous during the police interview and later corrected her statements.

Plausible reasons exist for the Arkansas Supreme Court to determine there was not a constitutional violation. The jury learned Sonyae's guilt-phase testimony was not the same as her

police-interview statements.   And Rankin has not shown Sonyae was manipulated by the prosecutor.   Consistent with the prosecutor's statements, Sonyae initially described clothing similar to the jacket and dark jeans recovered from Rankin's bedroom, and investigators found the murder weapon in a wooded area behind the Halfords' apartment.   Rankin confessed to the murders, and Dr. James reported that he was able to appreciate the criminality of his conduct. Rankin has not demonstrated the prosecutor suppressed evidence; or shown the prosecutor knowingly presented, or failed to correct, false evidence.   Fair-minded jurists could not find there was material evidence "put[ting] the whole case in a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. 419 at 435.

Rankin next argues the prosecutor failed to disclose the complete police investigation file, specifically papers related to officers' handling of physical evidence and interviewing witnesses. He also says the Pine Bluff police department refused to provide the investigation file on the murder of Rankin's sister, Paula Rankin, including evidence that Rodney was the primary suspect. And he says the police department provided only a two-page report from the Demmings burglary investigation file.

The missing papers are not part of the state-court record, and Rankin does not offer them here.   The prosecutor gave the *habeas* investigator access to the case file.   Rankin says that the prosecutor's file did not include a copy of the police investigation file, and that the police department has not been able to locate it.

Plausible reasons exist for the Arkansas Supreme Court's denial of  the *coram-nobis* motion on this point.   Rankin contends the trial lawyers could have done a better cross-examination of police witnesses, if they had been privy to these papers.   But he does not offer any argument, or otherwise demonstrate, that the allegedly missing papers would lead to material evidence.   He does

not say what more could have been done to discredit the physical evidence, or what he hopes to prove with the additional papers.  "Mere speculation is not sufficient to sustain a *Brady* claim." *United States v. Aleman*, 548 F.3d 1158, 1164 (8th Cir. 2008) (quotations omitted).  And the State cannot produce material that it does not possess.  *United States v. Sturdivant*, 513 F.3d 795, 803 (8th Cir. 2008).  Fair-minded jurists could not find Rankin has established a *Brady* violation.

Rankin next contends the Pine Bluff police department did not investigate other break-ins of the Demmings house.  In his affidavit, Demmings referred to these break-ins:

> Shortly after robbery in which the 9mm highpoint pistol was stolen, my house was broken into again.  During the fall/winter of 1994-1995, my house was broken into three times.

*Doc. 104-5 at 29*.  Rankin says information about these break-ins likely exists but was not disclosed to the trial lawyers.  He says the prosecutor withheld the reason these investigations were cut short. There is no indication, however, that the prosecutor suppressed any information.  Related police reports are not part of the record, and Demmings did not state whether he reported the trespasses to the police.  Rankin relies on then-Detective Daniel Dykes's testimony, but Dykes testified only that he was advised not to pursue an investigation related to the stolen VCR.  He did not address the other break-ins.

Plausible reasons exist for the Arkansas Supreme Court to determine there was not a *Brady* violation.  Fair-minded jurists could not find the prosecutor suppressed material evidence that "put the whole case in a different light as to undermine confidence in the verdict."  *Kyles*, 514 U.S. at 435.

Rankin also argues the prosecutor failed to disclose that practice effect caused the increase in his IQ score on the WAIS-R administered by Dr. Murphy.  In the *coram-nobis* motion, Rankin relied on McKissic's attestation:  The *habeas* lawyer told McKissic about the prosecutor's note on

practice effect. Rankin says the prosecutor knowingly elicited false testimony on this point at the intellectual-disability hearing.

Plausible reasons exist for the Arkansas Supreme Court to determine the prosecutor did not suppress material evidence. A *Brady* violation does not occur when the prosecutor fails to disclose "evidence to which the defendant had access to through other channels." *United States v. Anwar*, 880 F.3d 958, 969 (8th Cir. 2018). The trial lawyers knew about practice effect. McKissic examined both Nanak and Dr. Anderson about its influence. Fair-minded jurists could not find the prosecutor committed a *Brady* violation; or that the prosecutor knowingly presented, or failed to correct, false evidence. The outcome is the same if new evidence—the handwritten note from the prosecutor's file—is considered.

Under § 2254(d) review, each *Brady* claim individually fails; they fare no better when considered collectively. Nor has Rankin demonstrated the prosecutor knowingly presented, or failed to correct, false evidence. Claim 5 is denied.

**15. Penalty-Phase Instructions.** In Claim 6, Rankin contends the jury instructions related to mitigating evidence violated the Eighth and Fourteenth Amendments. He says the trial court instructed the jury to consider only unanimously agreed upon mitigating circumstances when weighing the appropriate punishment. Rankin also raises related ineffectiveness claims. Claim 6 is procedurally defaulted.

"The Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner." *Boyde v. California*, 494 U.S. 370, 377–78 (1990). A constitutional violation occurs when a trial court requires the jury to agree unanimously on the existence of a mitigating circumstance before any juror can consider it. *Mills v. Maryland*, 486 U.S. 367, 384 (1988). The circuit has recognized Arkansas's model jury instructions and

forms on mitigating circumstances satisfy *Mills*.   *Dansby*, 766 F.3d at 825.   The trial court,

however, deviated from the model papers in instructing the jury.

Prior to penalty-phase closing arguments, the trial court read from Arkansas's model jury

instructions, AMCI 2d 1008 (1994)[8], informing the jury that it would receive three forms to use in

reaching a sentencing decision, along with a verdict form:   (1) Form 1:   Aggravating

Circumstances, (2) Form 2:  Mitigating Circumstances, (3) Form 3:  Conclusions, and (4) Form 4:

Verdict.  Only the verdict form is part of the state-court record.

Tracking AMCI 2d 1008, the trial court instructed the jury that, if it unanimously found

beyond a reasonable doubt the existence of an aggravating circumstance listed on Form 1, then it

must complete Form 2.   The trial court thereafter gave only part of the model mitigating-

circumstances instruction:

> Now Form 2 lists some factors that you might consider as mitigating circumstances.
> However, you are not limited to this list.  You may, in your discretion, find other
> mitigating circumstances.
>
> Now unlike aggravating circumstances, you are not required to be convinced of the
> existence of mitigating circumstances beyond a reasonable doubt.   Now a
> mitigating circumstance is shown if you believe from the evidence that it probably
> existed.

Trial Record 1655.  The trial court omitted the remainder of the model instruction, including a

description of the four parts of the approved Form 2:

> Form 2 is made up of four parts.  Part A is a list of mitigating circumstances to be
> checked only if you unanimously agree that a particular mitigating circumstance
> existed.   Part B is a list to be checked where some of you think a mitigating
> circumstance or circumstances existed, but all do not agree.  Part C is a list to reflect
> circumstances of which there may have been some evidence but no member of the
> jury feels that the evidence was mitigating.  *The last part, Part D, is to be checked
> only if the jury concludes that there was no evidence of mitigating circumstances
> presented.*

---

[8] There are no substantive changes in the current version of AMCI 2d 1008 (2023).

AMCI 2d 1008 (1994) (emphasis in original).

> The trial court then read from Form 1 on aggravating circumstances:

> We, the jury, after careful deliberations, have unanimously determined that the following aggravating circumstance or circumstances existed beyond a reasonable doubt at the time of the commission of the capital murder.

Trial Record 1656.  After listing the statutory aggravating circumstances, the trial court read Form

2, Part A, with a list of potential mitigating circumstances:

> Form 2 that deals with mitigating circumstances.  We unanimously find that the following mitigating circumstances probably existed at the time of the murder:

> Here you are to check any applicable circumstances and/or specify any additional ones that you may consider.

> The capital murder was committed while Roderick Rankin was under extreme mental or emotional disturbance.

> The capital murder was committed while Roderick Rankin was acting under unusual pressures or influences or under the domination of another person.

> The capital murder was committed while the capacity of Roderick Rankin to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, intoxication, or drug abuse.

> The youth of Roderick Rankin at the time of the commission of the capital murder.

> The capital murder was committed by another person and Roderick Rankin was an accomplice and his participation was relatively minor.

> And Roderick Rankin had no significant history of prior criminal activity at the time of the murder.

> And then other for you to specify in writing any other mitigating circumstances that you find to exist.

> Those are the matters contained on Form 2 as to mitigating circumstances.

Trial Record 1658–59.  The trial court did not read or refer to Parts B, C, or D of Form 2 in the

model jury instructions.

The trial court next read Form 3, instructing the jury to weigh the aggravating and mitigating circumstances:

> Form 3 deals with the conclusions that you would have reached from consideration of Form 1 and Form 2. It reads as follows: The jury having reached its final conclusions will so indicate by having its foreman place a check mark in the appropriate space in accordance with the jury's findings. In order to check any space, our conclusion must be unanimous. The foreman of the jury will then sign at the end of the form.
>
> Now, we the jury conclude—the first space is one or more aggravating circumstances did exist beyond a reasonable doubt at the time of the commission of the murder. Now if you do not unanimously agree to check paragraph (a) on Form 3, then just skip (b) and (c) and sentence Roderick Rankin to life imprisonment without parole on Form 4. That's the verdict form.
>
> . . . Secondly, this is part (b) on Form 3. The aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstance found by any juror to exist. Now if you do not unanimously agree to check paragraph (b) then skip (c) and sentence Roderick Rankin to life imprisonment without parole.
>
> . . . Now paragraph (c). The aggravating circumstance justify beyond a reasonable doubt a sentence of death. If you do not unanimously agree to check paragraph (c), then—sentence Roderick Rankin to life imprisonment without parole on Form 4.
>
> If you have checked paragraphs (a), (b), and (c), then sentence Roderick Rankin to death on Form 4. Otherwise, sentence Roderick Rankin to life imprisonment without parole on Form 4.
>
> You understand Form 3 those are your conclusions. That's where you record your conclusions from consideration of Form 1 and Form 2.
>
> And Form 4 is, in fact, the verdict form itself. . . .

Trial Record 1659–60.

> After closing arguments, the trial judge again referred to the forms:
>
> The first instruction explains to you the use of the forms leading up to the verdict form. Form 1 prescribes specifically the statutorily defined aggravating circumstances. Form 2 provides for certain mitigating circumstances. Form 3 is where you would record your conclusions after considering each of the above. And then Form 4 is where you would record your verdict.

Trial Record 1687–88.

43

After the jury deliberated and returned to the courtroom, the trial court read the executed forms.  The jury unanimously found one aggravating circumstance—in the commission of capital murder, Rankin knowingly created a great risk of death to a person other than the victim.  The jury unanimously found two mitigating circumstances:  The capital murder was committed while Rankin was under extreme mental or emotional disturbance; and Rankin has or had no significant history of prior criminal activity at the time of the murder.  The trial court confirmed with the jury foreman that the findings were unanimous.  The trial court then read executed Forms 3 and 4, with the jury's finding that death was the appropriate punishment.

The trial court's truncated jury instruction and form on mitigating circumstances "must be viewed in the context of the overall charge."  *Boyde,* 494 U.S. at 378 (quotations omitted).  After directing the jury to mark only unanimously agreed upon mitigating circumstances, the trial court instructed jurors that, when balancing aggravators and mitigators, they must consider "any mitigating circumstance found by any juror to exist."  Trial Record 1659–60.  The overall jury charge is unlike the charge found unconstitutional in *Mills v. Maryland.*  In *Mills,* the trial court instructed jurors to write "yes" for unanimously agreed upon mitigating circumstances, and then to consider only the marked circumstances when weighing aggravators and mitigators.  486 U.S. at 377–84.  In *McKoy v. North Carolina,* the trial court similarly directed the jury to mark only unanimously agreed upon mitigating circumstances.  494 U.S. 433 (1990).  The United States Supreme Court held the "constitutional infirmity created by the unanimity requirement" was not "ameliorat[ed]" when the trial court subsequently instructed the jury to balance aggravating circumstances with "the mitigating circumstance or circumstances *found by you*?"  *McKoy,* 494 U.S. at 437, 439 (emphasis in original).  By comparison, the balancing instruction in Rankin's case specifically directed the jury to consider mitigating circumstances found by any juror.

Rankin has not stated any excuse for procedural default of the constitutional claim. The claim also fails under an alternative merits analysis. 28 U.S.C. § 2254(b). The trial court's unanimity instruction for marking mitigating circumstances on Form 2 was rectified when the court directed the jury to consider mitigating circumstances found by any juror. Rankin has not shown a substantial probability that reasonable jurors would interpret the overall jury charge to preclude independent consideration of any mitigating circumstance. *Mills,* 486 U.S. at 384. There is not a reasonable likelihood the challenged instruction prevented the jury from considering relevant evidence. *Boyde,* 494 U.S. at 380.

Rankin also contends his lawyers' work was constitutionally deficient at trial and on appeal for not challenging the jury instructions. These claims are also procedurally defaulted. Procedural default of the ineffectiveness-of-trial-counsel claim is not excused under a *Martinez-Trevino* analysis. Rankin has not demonstrated a substantial ineffectiveness claim. He has not shown that, absent the alleged error, there is a reasonable probability the jury would have chosen a different penalty. *Strickland,* 466 U.S. 688. Default of the ineffectiveness-of-appellate-counsel claim is not excused either; and it fails under an alternative merits analysis, 28 U.S.C. § 2254(b). Claim 6 is denied.

**16. Counsel's Ineffectiveness.** In the remaining ineffectiveness-of-counsel claims, Rankin argues the trial lawyers should have investigated and presented evidence that Rodney committed the murders. He says they should have done more to investigate and present penalty-phase evidence of his mental impairments and traumatic childhood. He says their work related to lesser-included jury instructions and prosecutorial misconduct also fell short. Rankin contends his lawyers failed to ensure the trial judge and jury were impartial. He argues that there was other attorney error during the penalty phase, and that McKissic had a conflict of interest. With some

of these Sixth Amendment claims, Rankin raises additional related constitutional error.  These are Claims 3, 6, 7, 8, 11, 14, 18, 21, and 22.

These claims are procedurally defaulted—with the exception of part of Claim 14.  To the extent Rankin made similar arguments in the motion to recall the mandate, the exhaustion requirement is not satisfied by raising a claim in that procedure.  *Dansby,* 766 F.3d at 829.  Papers proffered in the Appendix in support of the motion are not available for *habeas* review.  *Wooten,* 578 F.3d at 782–86.  The *Martinez-Trevino* equitable exception applies to the ineffectiveness-of-trial-counsel claims procedurally defaulted in the initial collateral-review proceeding.  *Martinez*, 566 U.S. at 14.  In a *Martinez-Trevino* analysis, evidence beyond the state-court record is barred.  28 U.S.C. § 2254(e)(2); *Shinn*, 142 S. Ct. 1718.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on has having produced a just result."  *Strickland*, 466 U.S. at 686.  Rankin must overcome the "strong presumption" that his lawyers acted "within the wide range of professional assistance."  *Id.* at 688–89.  To satisfy the *Strickland* prejudice element, he must demonstrate "a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different."  *Id.* at 694.

**Conflict Of Interest.**  In Claim 22, Rankin argues his trial lawyers had a conflict of interest adversely affecting his representation.  *Martinez-Trevino* applies.  *Dansby*, 766 F.3d at 836–37.  Because Rankin did not raise this point at trial, he must demonstrate a substantial claim that "an actual conflict of interest adversely affected his lawyer's performance."  *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).

To establish an adverse effect, Rankin must show "the conflict caused the attorney's choice, not that the choice was prejudicial in any other way." *Covey v. United States*, 377 F.3d 903, 908 (8th Cir. 2004) (quotations omitted). He must "identify a plausible alternative defense strategy or tactic that [his] defense counsel might have pursued, show that the alternative strategy was objectively reasonable under the facts of the case, and establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict." *Plunk v. Hobbs*, 766 F.3d 760, 764 (8th Cir. 2014) (*en banc*) (quotations omitted). If Rankin establishes an actual conflict of interest, a demonstration of *Strickland* prejudice is not required. *Cuyler*, 446 U.S. at 349–50. The United States Supreme Court has not decided if the *Sullivan* rule extends to successive representation. *Mickens v. Taylor*, 535 U.S 162, 176 (2002). The successive-representation issue also remains open under circuit precedent. *Compare Dansby*, 766 F.3d at 837 *with Morelos v. United States,* 709 F.3d 1246, 1252 (8th Cir. 2013).

Relying on McKissic's affidavit proffered in the Appendix, Rankin says McKissic's prior representation of Rodney prevented the trial lawyers from adequately investigating and casting suspicion on Rodney as the murderer. He contends that, because of McKissic's prior representation of his step-father, Earl Trimble, the lawyers did not investigate and present mitigating evidence that his step-father abused him. Rankin also argues McKissic had a conflict of interest during the direct appeal. He says that, while McKissic was representing him on appeal, the guilt-phase witness, Carter, was charged with two counts of felony forgery and represented by a lawyer from the same firm as McKissic.

Under a *Martinez-Trevino* analysis, procedural default of the ineffectiveness-of-trial-counsel claim is not excused. Even if the *Sullivan* rule applies to successive representations and McKissic's affidavit is considered, Rankin has not demonstrated an actual conflict adversely

affecting his trial lawyers' work. *Cuyler,* 446 U.S. at 348. The claim fares no better under a *Strickland* analysis. As outlined at pages 58 through 60, Rankin has not shown a substantial ineffectiveness claim related to investigation of Rodney. *Martinez*, 566 U.S. at 14. And the remainder of the claim is not sufficiently developed. Reasonable jurists would not debate whether the trial lawyers' work was constitutionally deficient. *Dorsey,* 30 F.4th at 756–57. The ineffectiveness-of-appellate-counsel claim fares no better. Procedural default is not excused; it also fails under an alternative merits analysis, 28 U.S.C. § 2254(b). Claim 22 is denied.

**Impartial Judge.** Rankin contends the trial lawyers failed to investigate the trial judge's bias or seek his recusal. He also raises a related due-process violation. This is Claim 21.

Just over four months before trial, the case was transferred to the Third Division of the Jefferson County Circuit Court, presided over by then-circuit-judge Fred D. Davis, III. Rankin says the state-court lawyers were remiss in not seeking Davis's recusal. He argues Davis's dependence on re-election to judicial office, combined with his history of disciplinary reprimands and criminal convictions, created an appearance of bias. Rankin says that, under those circumstances, an average person would be tempted to avoid unpopular rulings in a capital-murder case.

Rankin points to Davis's five letters of reprimand from the Arkansas Judicial Discipline and Disability Commission between 1995 and 2001. Rankin was convicted and sentenced in February 1996. On remand, Davis held a suppression hearing in February and March of 1998. He denied the suppression motion in October 1998. Rankin filed the petition for post-conviction relief in February 2000. *Doc. 171-10 at 25.*

In June 2004, Davis was cited for driving while intoxicated (DWI), failure to register a vehicle, and misuse of dealer tags. While those charges were pending, the Arkansas Supreme

Court, on July 13, 2004, granted the Commission's petition to temporarily suspend Davis from his judicial duties.  *In re Davis,* 358 Ark. 351 (2004) (*per curiam*).  On the same date, Davis entered an order denying the Rule 37 petition.  *Doc. 171-10 at 307.*  Davis was later found guilty of the DWI offense.  *Ligon v. Davis*, 2012 Ark. 440, *2.

After Davis's traffic stop, facts were uncovered leading to additional charges.  In February 2005, Davis was found guilty of attempting to evade or defeat the sales tax on his vehicle; the Arkansas Court of Appeals affirmed, *Davis v. State*, 94 Ark. App. 240 (2006).  The Arkansas Supreme Court thereafter denied the Commission's petition for disbarment, but suspended Davis from practicing law for five years.  *Ligon,* 2012 Ark. 440.

"Most matters relating to judicial disqualification do not rise to a constitutional level."  *Caperton v. A.T. Massey Coal Company, Inc.*, 556 U.S. 868, 876 (2009).  "Recusal is required when, objectively speaking, the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable."  *Rippo v. Baker*, 580 U.S. 285, 287 (2017) (quotations omitted).  The question is not "whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias."  *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016) (quotations omitted).  Rankin says that, because circuit judges are elected, an average judge with Davis's publicized history would have been tempted to avoid unpopular rulings.

Under these circumstances, Rankin has not demonstrated an unconstitutional potential of bias.  This is not a case, moreover, where a trial judge had a "financial interest in the outcome."  *Caperton,* 556 U.S. at 877–79.  Davis's DWI and tax-evasion convictions, and the five-year suspension, occurred after Davis denied post-conviction relief.  Rankin therefore cannot show the

trial lawyers' work was constitutionally inadequate.  To the extent Rankin challenges his post-conviction lawyers' work, relief is not available.  *Coleman,* 501 U.S. at 752.

Under a *Martinez-Trevino* analysis, procedural default of the ineffectiveness claim is not excused.  Reasonable jurists would not debate whether the lawyers' performance fell short of the constitutional standard; or whether there is a reasonable probability that seeking recusal would have made a difference in state-court  proceedings.  *Dorsey,* 30 F.4th at 756–57.  No excuse exists for procedural default of the related judicial-bias claim either.  And it fails under an alternative merits analysis.  28 U.S.C. §  2254(b).  Claim 21 is denied.

**Supervision Of Expert.**  Rankin contends the trial lawyers' work was constitutionally deficient because they failed to adequately supervise Dr. Murphy's assessment of intellectual disability.  He also raises a related due-process violation.  This is Claim 18.

For the ineffectiveness claim, Rankin relies on *Hinton v. Alabama*, in which the United States Supreme Court held the trial lawyer's work was constitutionally ineffective when, because of the mistaken belief that funding was not available, the lawyer did not seek to replace an inadequate expert.  571 U.S. 263, 274 (2014).  Rankin's lawyers did not make a similar error.  In contrast, the record reflects they worked hard to convince the trial court that additional funding was needed for a more thorough neuropsychological examination by Dr. Murphy.

Rankin's primary argument is that the trial lawyers failed to supervise and direct Dr. Murphy's evaluation of intellectual disability.  He says Dr. Murphy ignored professional standards and mis-scored the WAIS-R.  The trial lawyers, however, did not engage Dr. Murphy to conduct an intellectual-disability evaluation.  As outlined at page 15, the trial lawyers retained the expert to conduct a neuropsychological evaluation in preparation for a mental-disease-or-defect defense.  Dr. Murphy administered the WAIS-R as part of the evaluation, and he reported Rankin's 72 IQ

score fell in the range of mild to borderline intellectual impairment.  His evaluation did not include an intellectual-disability assessment.

Rankin has not demonstrated the trial lawyers should have been "alerted" that greater supervision of Dr. Murphy was needed.  *Marcrum v. Luebbers,* 509 F.3d 489, 511 (8th Cir. 2007).  Their penalty-phase strategy focused on Rankin's diminished capacity as a mitigating circumstance.  Dr. Murphy testified that he evaluated Rankin for psychological disorders related to his competency, state of mind during the crime, and potential mitigating information.  As outlined at page 66, Dr. Murphy concluded Rankin was delusional and possibly in a manic state when he committed the murders.

To the extent Rankin challenges the trial lawyers' work based on Dr. Murphy's administration of the WAIS-R, he has not shown constitutionally deficient performance.  Dr. Murphy testified during the penalty phase that Rankin's 72 IQ score was likely elevated due to practice effect.  Rankin does not say how the trial lawyers should have been aware of the purported one-point scoring error.  He has not demonstrated the *Strickland* standard required the lawyers— at the time of his 1994 trial—to direct a downward adjustment of his IQ score based on the Flynn Effect.  *See Dunn,* 141 S. Ct. at 2408–09.

Rankin also raises an *Ake* violation.  Under *Ake,* he was entitled to "access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense."  *Ake v. Oklahoma,* 470 U.S. 68, 83 (1985).  *Ake* applies to require appointment of an expert to assist with an intellectual-disability defense.  *Starr v. Lockhart,* 23 F.3d 1280, 1288 (8th Cir. 1994), *superseded by statute on other grounds as stated in Williams*, 576 F.3d 850.  Rankin, however, does not argue his constitutional rights were violated because the trial court denied his request for more psychiatric assistance or limited his access to assistance.

His due-process claim is that Dr. Murphy's assessment was inadequate. *Ake* does not recognize a constitutional right to effective assistance of expert witnesses. *Fisher v. Angelone*, 163 F.3d 835, 853 (4th Cir. 1998). There is no *Ake* violation when the trial court grants the defendant's requested access to the expert of his choice. *Parker v. Norris,* 64 F.3d 1178, 1184–85 (8th Cir. 1995).

Under a *Martinez-Trevino* analysis, procedural default of the ineffectiveness claim is not excused. Rankin has not shown the claim is substantial. *Martinez*, 566 U.S. at 14. He has not demonstrated the trial lawyers' supervision of Dr. Murphy was constitutionally unreasonable; or a reasonable probability that, with a more thorough neuropsychological examination, the trial court or jury would have found him ineligible for the death penalty based on intellectual disability. *Strickland,* 466 U.S. 688. No excuse exists for procedural default of the related due-process claim either. And it fails under an alternative merits analysis. 28 U.S.C. § 2254(b). Claim 18 is denied.

**Jury Selection.** Rankin says that an impartial jury was seated, and that the trial lawyers were remiss in not seeking for-cause removal of five actually biased jurors: Gary Lynch, Dennis Graves, John Smith, Dianne McGeorge, and Demara Rideau. The lawyers used peremptory strikes on Lynch and Graves. They were "removed from the jury as effectively as if the trial court had excused [them] for cause." *Ross v. Oklahoma*, 487 U.S. 81, 85–86 (1988). The focus therefore is on the seated jurors: Smith, McGeorge, and Rideau. This is Claim 11.

Each seated juror was questioned about their experiences and relationships; all responded that nothing would affect their ability to be a fair and impartial juror. Smith worked at the Arkansas Department of Correction for fifteen years; he was a pastor at Shiloh Baptist Church. McGeorge employed Zena Reynold's father as her "yard man" but had not talked to him about the case. Zena's father told McGeorge only that there had been a crime. And she "didn't know enough one way or the other" to form an opinion about Rankin's guilt or innocence. Trial Record 646.

McGeorge also has a younger brother who works for the ADC, but she did not know his job duties or talk to him about his work.  McGeorge thought she and the prosecutor, Betty Dickey, were members of the same country club; and she knows Dickey well enough to say hello.  Rideau, as a teen-ager, witnessed her father kill her mother; he was sentenced to life imprisonment.   She responded that she would be able to put that experience aside because "they've got to prove that they did it."  Trial Record 782.

Under a *Martinez-Trevino* analysis, Rankin has not demonstrated a substantial ineffectiveness claim.  *Martinez*, 566 U.S. at 14.  He has not shown the trial lawyers' jury strategy amounted to deficient performance or resulted in *Strickland* prejudice.  466 U.S. 688.  He has not demonstrated the jury was tainted or a seated juror was biased.  *Sanders v. Norris*, 529 F.3d 787, 790–91 (8th Cir. 2008).  There is no excuse for procedural default of the related trial-error claim either.  And the claim fails under an alternative merits analysis.  28 U.S.C. § 2254(b).  Rankin has not shown jurors were "actually biased against him."  *Mack v. Caspari*, 92 F.3d 637, 642 (8th Cir. 1996) (quotations omitted).  Claim 11 is denied.

**Prosecutorial Misconduct.**  Rankins contends the trial lawyers committed constitutional error in the guilt phase when they did not object to prosecutorial misconduct.  He says the cumulative effect of the misconduct violated his due-process right.  This is Claim 8.

Rankin argues the prosecutor engaged in four acts of misconduct:  (1) eliciting testimony in violation of a trial-court order; (2) repeatedly advancing the false argument that the right Reebok shoe, size 12, seized by investigators "matched" the shoeprint on the victims' front-door decoration, (3) making improper victim-impact and religious arguments during closing, and (4) inserting personal opinion into closing argument.  Rankin says prejudice from these errors was magnified because the trial court failed to give sufficient curative instructions.

Rankin first says the prosecutor, in violation of a court order, elicited testimony from police-department witnesses that they saw blood on the seized left Reebok shoe. Before trial, the trial lawyers moved to exclude the State Crime Lab report stating human blood was found on the shoe and on one pair of jeans from Rankin's bedroom. They argued that, because the Crime Lab reported there was not enough blood for further characterization, the evidence could not be connected to the crime scene and therefore would be excessively prejudicial. From the bench, the trial court granted the motion. The prosecutor later sought clarification of the trial court's order, asking if the order extended beyond scientific evidence to the observations of officers who seized the items. The trial court did not address the prosecutor's clarification request.

At trial, two Pine Bluff Police Department witnesses—Cathy Ruhl, a forensic crime-scene technician, followed by investigator Dykes—referred to blood on the Reebok shoe, in response to the prosecutor's direct examination about investigation procedures. Trial lawyers objected to Dykes's testimony. Outside the presence of the jury, the prosecutor responded that the pretrial order did not exclude the witnesses' observation testimony but that he nonetheless tried to prevent it. He remembered instructing Ruhl not to testify about the blood, but he was not certain if he had given the same warning to Dykes. The trial court found the witnesses' testimony violated the order, but was not convinced their "blurt[ing] out" their observations caused "serious damage." Trial Record 1196–97, 1203–04. The trial court found an admonishment would cure any prejudice, but reserved a ruling on the appropriate wording.

After presenting the defense case, the trial lawyers renewed the admonishment request. The trial court questioned whether an admonishment would only draw the jury's attention to the testimony, noting "the bell was, if anything, extremely softly rung" because the witnesses' comments were "in passing" and arguments were made outside the jury's presence. Trial Record

1491.  The trial lawyers believed an admonishment was the better course.  With agreement on the admonishment wording, the trial court instructed the jury that, based on lawyers' assurances, "there is no scientific evidence available to prove that any substance found on the defendant's tennis shoes was related to or came from the crime scene."  Trial Record 1484–95.

On direct appeal, Rankin argued the trial court erred in refusing to grant a mistrial when the prosecutor violated the order.  The Arkansas Supreme Court denied relief, holding the trial lawyers did not seek a mistrial and agreed to the admonishment.  *Rankin I*, 329 Ark. at 386–89, 948 S.W.3d at 401–02.  Rankin then argued in the Rule 37 proceeding that the trial lawyers were remiss in not moving for a mistrial based on Dykes's testimony.  McKissic testified that he did not seek a mistrial because of the favorable jury composition.   The circuit court found Rankin conceded the point in his post-hearing brief, and Rankin did not appeal.

Rankin's second misconduct point is the prosecutor—through argument and witness testimony—misrepresented that the shoeprint on the Halfords' front-door decoration "matched" the right Reebok shoe seized during the consent search.  Donald Smith, a criminalist in the State Crime Lab trace-evidence section, compared the right Reebok shoe, size 12, to the shoeprint on the door decoration.  He testified the shoeprint was made by a shoe of the same "general size" and "tread pattern" as the seized Reebok.   Trial Record 1326–27.   But he said the test results were inconclusive because there were no distinguishable characteristics on the shoe bottom that were observable on the shoeprint.  The trial lawyers repeatedly challenged the prosecutor's and police witnesses' characterization of the shoeprint and Reebok shoe as matching.  They cross-examined Smith about his conclusions, and they argued in rebuttal closing that the prosecutor's characterization was a "lie."  Trial Record 1528.

Rankin's third misconduct point is the prosecutor improperly appealed to the jury's passions and fears by raising the impact of the victims' death and their Christian faith.  During guilt-phase closing, the prosecutor argued the "loss of Zena Reynolds and Ernestine Halford and Nathaniel Halford are tragic not only for Sonyae Reynolds . . . but for those of us in the community who feel the loss of these good, decent Christian people."  Trial Record 1510.  Rankin also says the prosecutor impermissibly gave personal opinions in two lines of closing argument:  (1)  "We asked that you find Roderick Rankin guilty of capital murder because I know as surely as I stand before you today that w[ith] premeditation and deliberation he walked over to the apartment where Sonyae Reynolds lived," Trial Record 1511; and (2) "Now you are going to make a decision whether this is a trumped-up confession. . . . I don't believe that's what you will find.  I don't believe anybody could find that.  There is nothing consistent with this confession at all," Trial Record 1562.  The trial lawyers did not object to the statements.

Procedural default of the ineffectiveness claim is not excused.  Under a *Martinez-Trevino* analysis, the claim is not substantial.  *Martinez*, 566 U.S. at 14.  The trial lawyers challenged the testimony and argument presented by the prosecutor.  They sought and received an admonishment about the errant blood references; they repeatedly challenged the prosecutor's efforts to characterize the shoeprint as matching the seized Reebok shoe.  And their decision not to object during closing argument was a matter of trial strategy.  Reasonable jurists would not debate whether the trial lawyers' performance was constitutionally ineffective; or whether a reasonable probability exists that, absent the alleged errors, the jury would have reached a different verdict.  *Dorsey*, 30 F.4th at 756–57.  To the extent Rankin abandoned the ineffectiveness claim related to the blood testimony in the Rule 37 appeal, *Martinez-Trevino* does not apply.  *Franklin v. Hawley,* 879 F.3d 307, 313 (8th Cir. 2018).  But Rankin has not shown any excuse for procedural default

under a general cause-and-prejudice analysis either.  And the claim fails under an alternative merits analysis.  28 U.S.C. § 2254(b).

Rankin has not offered any excuse for procedural default of the prosecutorial-misconduct claim.  And it fails under an alternative merits analysis.  28 U.S.C. § 2254(b).  The prosecutor's witness-examination and argument did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  This is not a case where the prosecutor knowingly used false testimony.  *Giglio,* 405 U.S. 150; *Napue*, 360 U.S. 264.  The alleged errors did not have a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637 (quotations omitted).  Claim 8 is denied.

**Failure To Investigate Rodney.**   Rankin argues the trial lawyers' work was constitutionally deficient because they did not retain a fact investigator or follow up on their suspicion that Rodney committed the murders.  Rankin says that physical evidence pointed to Rodney as the killer, and that he had a motive.  This is Claim 3.

The trial lawyers had a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 691.  Review of their work is "highly deferential," and "every effort [must] be made to eliminate the distorting effects of hindsight."  *Id.* at 689.   "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *Id.* at 690–91.  "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Id.*

Rankin says the trial lawyers were remiss in not discovering that he wears a size 14 shoe and Rodney wore a size 12 shoe.  He contends that, with this evidence, they could have argued

Rodney made the size 12 shoeprint on the Halfords' front-door decoration.  Rankin also says the trial lawyers should have discovered the seized jeans with the blood stain—too small for characterization—belonged to Rodney.  He says investigators seized six pairs of jeans in two different sizes—waist and length—from behind his chest-of-drawers.  He says the jeans with the blood stain were a size 42 waist and fit Rodney.  He says the jeans, with a size 38 waist and longer length, belonged to him.  Rankin next contends that, after the trial lawyers learned Rodney was suspected in unsolved murder of their sister, Paula Rankin, the lawyers should have done more with that evidence.  He says they should have presented character evidence that he is quiet and respectful, and that Rodney, prone to violent, abusive behavior, was angry with Zena, who recently left him and was seeking child support.

Rankin relies on affidavits and ADC records in the Appendix.  Even if these papers are considered, they fall short of demonstrating attorney error.  The Appendix papers did not point to any available evidence that Rodney killed his sister, Paula.  There were attestations that Rodney was angry with Zena and likely to be violent towards her.  But the affiants did not refer to available evidence linking Rodney to the murders.  The Appendix did not include a record of Rodney's sizes—shoes or pants—or the sizes of the seized pants.  There were only family recollections; photocopied pages from a state-court brief; and McKissic's attestation that he believed Rodney killed Zena and the Halfords, and that Rodney was the primary suspect in his sister's murder.

According to ADC records, Rankin wears a size 14 shoe.  But the trial evidence left little room to argue the seized size 12 Reeboks did not belong to Rankin.  The shoes were discovered under the couch where Rankin had been laying.  Sonyae testified they belonged to Rankin.  Rankin's testimony was that he owned a pair of Reeboks, but was not wearing them on the night of the murders.

58

Rankin has not shown a substantial ineffectiveness claim under the *Martinez-Trevino* equitable exception. *Martinez,* 566 U.S. at 14. Reasonable jurors would not debate whether the trial lawyers' investigation was constitutionally inadequate; or whether a reasonable probability exists that more investigation would have made a difference. *Dorsey,* 30 F.4th at 756–57. Claim 3 is denied.

**Lesser-Included Offenses.** Rankin contends the trial lawyers committed constitutional error when they did not request an instruction on lesser-included offenses of capital murder. He also makes a related trial-error argument. This is Claim 7.

The undisputed trial evidence was that the killer—armed with the murder weapon stolen in a recent burglary—went to the Halfords' apartment in the middle of the night. He kicked in the locked front door and shot the three victims at close range. The defense theory was that Rankin was innocent of the murders. He testified that he confessed to the murders only after investigators pressured him. At the end of the guilt phase, the trial court instructed the jury that, to find Rankin guilty of capital murder, it must determine beyond a reasonable doubt that he had a premeditated and deliberated purpose of causing the deaths of the three victims.

Rankin was entitled to a lesser-included offense instruction only if the evidence supported a first or second-degree murder verdict. *Hopper v. Evans,* 456 U.S. 605, 611 (1982); *Beck v. Alabama,* 447 U.S. 625, 627 (1980). Due to the defense theory of innocence, there was no basis for a lesser-included instruction. *United States v. Elk,* 658 F.2d 644, 649 (8th Cir. 1981); *United States v. Collins,* 652 F.2d 735, 742 (8th Cir. 1981). Physical evidence and witness testimony of the murder circumstances, moreover, did not warrant a lesser-included instruction.

The parties spar over the timing of the procedural default of the ineffectiveness claim. The *Martinez-Trevino* equitable exception does not apply if the ineffectiveness claim was abandoned

on appeal. *Franklin,* 879 F.3d at 313.  To avoid the tangle, the Court considers the claim under an alternative merits analysis.  28 U.S.C. § 2254(b).  Because Rankin has not demonstrated a constitutional violation, the ineffectiveness claim is without merit.  The trial lawyers' decision not to request lesser-included instructions, or object to their absence, was "within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689.  Rankin has not demonstrated a reasonable probability that additional instructions would have made a difference.  He has not shown any excuse for procedural default of the related trial-error claim.  The claim also fails under an alternative merits basis for the same reasons that the ineffectiveness claim is without merit.  28 U.S.C. § 2254(b).  Claim 7 is denied.

**Penalty-Phase Evidence.**  Rankin argues the trial lawyers should have worked harder to investigate and present penalty-phase evidence of his traumatic childhood; and his intellectual disability, neuropsychological deficits, and mental illness.  He says their work was constitutionally deficient during cross-examination of penalty-phase witnesses, Nanak and Dr. Anderson.  Rankin also contends the lawyers elicited impermissible testimony from victim-impact witnesses.  This is Claim 14.

During Rule 37 proceedings, Rankin raised a related argument:  The trial lawyers were constitutionally ineffective for not calling his maternal aunt, Doris Ellis, and Rodney as mitigation witnesses.  McKissic testified that he advised Rankin that his mother, Elaine Trimble, along with Ellis and Rodney, needed to testify.  But Rankin did not want his mother called as a witness. McKissic's understanding was that, based on Rankin's insistence that only Dr. Murphy testify, he did not want to call any family members as witnesses.  McKissic also testified that calling Rodney as a witness was problematic "due to a question about his possible involvement in the murder." Rule 37 Record 256.  Applying *Strickland,* the Arkansas Supreme Court held Rankin had not

demonstrated the trial lawyers' work was constitutionally deficient. *Rankin III,* 365 Ark. at 258–60, 227 S.W.3d at 927–28. The Supreme Court did not address *Strickland* prejudice. *Id.* at 260 n.4, 227 S.W.3d at 928 n.4.

Rankin's *habeas* argument about his childhood circumstances was fairly presented, and therefore exhausted, in state court, if it does not offer "significant additional facts." *Ward v. Norris*, 577 F.3d 925, 935 (8th Cir. 2009) (quotations omitted). "[C]losely related claims containing an arguable factual commonality may be reviewed." *Id.* The claim does not have to be an "exact duplicate" of the state-court claim, but it must have "the same legal and factual bases." *Id.* An arguable factual commonality exists between the state-court argument and *habeas* claim: The trial lawyers failed to present Rankin's complete life story with family members as penalty-phase witnesses. This part of the *habeas* claim therefore is exhausted. The Arkansas Supreme Court had a "fair opportunity to consider [the claim] and to correct that asserted constitutional defect." *Picard v. Connor*, 404 U.S. 270, 276 (1971). This Court will review the claim under 28 U.S.C. § 2254(d).

The trial lawyers called one penalty-phase witness: Dr. Murphy. McKissic testified at the Rule 37 hearing that the defense team "talked about calling a number of relatives and [he] had talked to . . . a number of relatives." Rule 37 Record 247. He wanted to call Elaine Trimble as a witness to "verify certain things that the psychiatrist had been told by Roderick" and for "emotional impact." Rule 37 Record 254. McKissic said Ellis and Rodney had been in his office multiple times to tell him about Rankin's "upbringing and insights into who he was and how he behaved." Rule 37 Record 248. Both Ellis and Rodney testified at the Rule 37 hearing that they would have told the jury about Rankin's positive characteristics, how he worked to support his mother, the effect of his sister's death on his mental health, and how his family would suffer from a death

sentence. Rankin's *habeas* argument offers new details about his childhood. This Court's review, however, is limited to the state-court record. *Pinholster,* 563 U.S. at 181–82. As outlined at pages 46 through 47, the Appendix papers are not part of the state-court record available for this Court's review.

The Arkansas Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law; or an unreasonable determination of the facts. 28 U.S.C. § 2254(d). The trial lawyers' investigation and penalty-phase witness decisions were constitutionally adequate. The Supreme Court was not unreasonable in holding the trial lawyers' witness decisions were trial strategy: Rodney "might have been a liability," and Ellis "would have been less convincing, especially when immediate family members, such as his mother and brother, were not called to testify on his behalf." *Rankin III,* 365 Ark. at 258–60, 227 S.W.3d at 927–28. This part of Claim 14 is denied. If the Court has taken a wrong turn on the exhaustion point, the outcome is the same. Because the ineffectiveness claim is not substantial, procedural default is not excused under a *Martinez-Trevino* analysis. *Martinez,* 566 U.S. at 14.

Rankin next argues the trial lawyers were remiss in exclusively focusing on mental disease or defect instead of utilizing Dr. Murphy for a broader mental evaluation. Rankin says that, with a more comprehensive assessment, the trial lawyers could have presented penalty-phase evidence that he has a personality disorder and neuropsychological impairments, along with symptoms of schizophrenia, breaks in reality, and "thought blocking." Rankin points to the brevity of Dr. Murphy's evaluation report; he says the trial lawyers failed to provide Dr. Murphy with a social history. Rankin also argues the trial lawyers' work was constitutionally inadequate because they failed to engage another expert to review Dr. Murphy's work and conduct an intellectual-disability evaluation. He says that, with an intellectual disability diagnosis, the trial lawyers could have re-

raised death-penalty ineligibility due to intellectual disability for the jury's consideration, as permitted by Ark. Code Ann. § 5-4-618(d).  Rankin mostly relies on Affidavit papers barred from this Court's review.

In the court-ordered evaluation, SAMHC examiners assessed Rankin for competency and intellectual disability.  Recognizing the need for a second evaluation, the trial lawyers requested Dr. Murphy's curriculum vitae.  Dr. Murphy has a doctorate in clinical and physiological psychology.  He had evaluated approximately 180 defendants charged with homicide offenses. The trial lawyers repeatedly argued funding was necessary for psychological testing.  At the time, Rankin's anticipated defense was not guilty due to mental disease or defect.

After McKissic argued the SAMHC testing did not adequately assess whether Rankin had "active psychosis," Trial Record 338, the trial court authorized $3500.00 for the additional testing. Dr. Murphy administered twenty different tests to assess intellectual functioning, memory, neuropsychological deficits, and mental illness; and he reported his findings:

> Intellectually [Rankin] is a mildly to borderline mentally retarded individual with a history of special education in school.  He achieved the eighth grade, but was retained several times at that level.  His reading skills are above spelling and arithmetic skills.  Memory function, judgement, mental speed are his poorest areas of cognition.  Visual memory appears specifically deficient relative to verbal memory.  The registration in consciousness of events is impaired while his capacity to learn skills is not.  This implicates likely impairment in certain subcortical brain structures responsible for conscious recall. Also neuropsychological deficits appear in locations which coincide with psychiatric mood disorders.

> Diagnostic psychological personality testing found that he is suffering from both thought disorder symptoms as well as those from a mood disorder.  His reality testing is clearly deficient, while his thinking is not excessively disordered.  He suffers from various hallucinations, possible illusions and primitive delusions. These do not appear to be schizophrenic in nature, but are clearly psychotic.  The form of his disorder has a high likelihood of having a necessary, but sufficient hereditary causation.

> DIAGNOSITIC IMPRESSION
> Psychotic Mood Disorder, possibly of a Bipolar type

Post Traumatic Stress Disorder

CONCLUSIONS
Mr. Rankin most likely suffered from such a mental disease or defect as to render him legally insane at the time of the commission of the crime for which he is charged.

Trial Record 423.

McKissic then asked the trial court for an additional $5000 for more testing of organic psychological deficiencies.  Trial Record 329.  Dr. Murphy believed Rankin's deficits were hereditary, so he wanted to interview his mother and obtain family-history data.  McKissic said Dr. Murphy's expertise was in evaluating how a person is "formed emotionally [and] psychologically."  Trial Record 338.  He said Dr. Murphy was trying to determine how Rankin's brain functioned and his condition.  McKissic argued the evidence could be introduced in both the guilt and penalty phases to explain Rankin's behavior.  He wanted to demonstrate how Rankin developed—based on biological factors, experiences, and environment.

The trial court questioned the necessity of further testing, particularly the need for Dr. Murphy to interview Rankin's mother.  Dr. Murphy lived in Oklahoma, and the trial court had a "serious problem" with authorizing funds for an expert who required travel expenses.  Trial Record 416–17.  The trial court reluctantly authorized an additional $2500 for Dr. Murphy to testify at trial, and for further testing if funds were available.

After Rankin amended his plea to not guilty based on a general-denial defense, the trial lawyers did not call Dr. Murphy to testify during the guilt phase.  Their penalty-phase strategy was based on the theory that Rankin "had a low intelligence quotient coupled with some traumatic events which had occurred during his life" and was "not a person who was cold, calculating, murderous in his heart . . .."  Rule 37 Record 254.   They focused on presenting penalty-phase evidence of neuropsychological deficits and mental illness.

Dr. Murphy testified Rankin never passed the eighth grade and had an IQ score in the mild, or borderline, range of intellectual functioning.  He described signs of mental illness and developmental delays during Rankin's childhood and teen years:  Rankin regressed developmentally as a toddler when he went to live with his grandmother, and he had speech difficulties.  As a child, Rankin had "unusual types of fantasies" and was sexually abused over several months by a man living in his home.  Trial Record 1598.  When Rankin was treated for depression in 1991 at age fifteen, his clinic intake interview responses showed signs of grandiosity, paranoia, and ornamentation; he attempted suicide during this time period.  At age sixteen, Rankin began having visual and auditory hallucinations.  At seventeen, he was not allowed to continue school past the eighth grade, and he suffered another major depression.

Dr. Murphy explained test results showed Rankin was extremely withdrawn and depressed, had a coping deficit (unable to control emotions and makes poor decisions), and had poor reality testing (difficulty distinguishing "real from unreal").  Trial Record 1606.  Dr. Murphy said these results showed Rankin suffered from a prominent delusional disorder, major depression, and extreme PTSD.  He did not believe Rankin was schizophrenic; he diagnosed him as a likely bipolar manic depressive, possibly schizo-effective.  Dr. Murphy told the jury that Rankin may have been in a manic state when he committed the murders.  He testified that, based on Rankin's suicide gesture shortly before the murders and the murder circumstances, his opinion was that Rankin was "not in full control of his faculties" and "more crazy than normal" at the time of the murders.  Trial Record 1613.

On this record, there was nothing to "alert" the trial lawyers that Dr. Murphy's neuropsychological assessment and conclusions were inadequate.  *Marcrum,* 509 F.3d at 511. They worked hard for authorization of additional funding for more extensive testing.  Dr.

Murphy's penalty-phase testimony provided a compelling story of mental illness and impairment. It is unlikely the trial court would have authorized funding for another expert to review Dr. Murphy's work or conduct another intellectual-disability assessment for the penalty phase. The trial court had already considered expert testimony and found Rankin was not intellectually disabled. Reasonable jurists would not debate whether the trial lawyers' performance was constitutionally ineffective; or whether a reasonable probability exists that, absent the alleged errors, the jury would have reached a different verdict. *Dorsey*, 30 F.4th at 756–57. This part of the ineffectiveness claim is not substantial. *Martinez*, 566 U.S. at 14. Procedural default is not excused.

Rankin also contends the trial lawyers should have done more to challenge the penalty-phase testimony of Nanak and Dr. Anderson. Nanak told the jury that Rankin did not have an intellectual disability. On cross-examination, Kearney elicited testimony that, as a psychological examiner, Nanak was not qualified to make a diagnosis. Before trial, Dr. Anderson reviewed Rankin's 1991 mental-health records and Dr. Murphy's evaluation report, and he interviewed Rankin. He disagreed with Dr. Murphy's conclusions, and he believed Rankin was overreporting. On cross-examination, Dr. Anderson testified that he was not able to conduct a formal assessment because Rankin refused to cooperate. He told the jury that Rankin "refused to answer even simple questions" and would not acknowledge that he had been arrested. Trial Record 1653.

Rankin says the trial lawyers should have argued his lack of cooperation with Dr. Anderson was evidence of his innocence and intellectual disability. He says they missed red flags in Nanak's report. Rankin, however, has not demonstrated the trial lawyers' work on these points was constitutionally ineffective. He has not sufficiently developed the argument that Nanak's report required more investigation. There is not a reasonable probability that, absent the alleged errors,

the jury would have chosen a different sentence.  Under a *Martinez-Trevino* analysis, procedural default is not excused.  This part of the claim fails.

Rankin also argues the trial lawyers were constitutionally ineffective for eliciting prohibited victim-impact testimony.  Kearney cross-examined Phillip Reynolds, Jr., the father of Zena and Sonyae Reynolds.  He incorrectly anticipated Reynolds, a minister, would oppose imposition of the death penalty.  When Kearney asked Reynolds about the appropriate punishment, Reynolds responded that he wanted Rankin punished "to the maximum" with death.  Trial Record 1580–81.  It is true a family member's opinion about the appropriate sentence is impermissible. *Payne v. Tennessee*, 501 U.S. 808, 830 n.2 (1991); *Williams v. Norris*, 612 F.3d 941, 951–52 (2010).  But Rankin raises the error as an ineffectiveness claim.  Under a *Martinez-Trevino* analysis, Rankin has not demonstrated the claim is substantial.  *Martinez,* 566 U.S. at 14.  He has not shown a reasonable probability that, absent the victim-impact testimony, the jury would have chosen a life sentence.  *Strickland,* 466 U.S. 688.  Procedural default is not excused.  Claim 14 is denied.

**17.  Actual Innocence.**  Rankin says procedural default of the *habeas* claims is overcome because he is actually innocent of capital murder.  He also raises a freestanding actual-innocence claim.  Rankin points to new evidence—Pastor Bailey's statement about Rodney's confession.  This is Claim 1.

In May 2009, Pastor Bailey first told the *habeas* investigator about Rodney's confession.  She did not believe that she was able to provide this information earlier because, while Rodney and Elaine Trimble were alive, she was bound to confidentiality by her role as a minister and counselor.  According to the *habeas* papers, Trimble died earlier in 2009, and Rodney died in 2006.  In her deposition, Pastor Bailey stated that, prior to the murders, Rodney talked to her during

several counseling sessions about wanting custody of his children with Zena.  She said Rodney was furious with Zena and threatened to kill her.  Pastor Bailey stated that, a few days after the murders, Rodney confessed to her during a counseling session that he killed the victims.  She said Rodney showed her the blood stains on his shoes.  She said that, when she later counseled Rodney and his mother together, Rodney confessed again.  Pastor Bailey died in 2011.

While in state court, Rankin sought *coram-nobis* relief based on Pastor Bailey's deposition. In Arkansas courts, a writ of *error coram nobis* is available based on a third-party confession to the crime, if the petitioner raises the claim between the judgment of conviction and its affirmance. *McKinney v. State,* 220 Ark. 226, *2, 4.  Because Rankin filed the *coram-nobis* petition after his conviction was affirmed, the presumption is overcome that the Arkansas Supreme Court's summary denial was on the merits.  *Harrington,* 562 U.S. at 99–100.  There are no findings of fact requiring a presumption of correctness under 28 U.S.C. § 2254(e)(1).

Actual innocence can be a gateway for procedurally defaulted claims in certain circumstances.  Rankin must establish that, in light of the new and reliable evidence, "it is more likely than not that no reasonable juror would have convicted him." *Schlup v. Delo*, 513 U.S. 298, 324, 326–27 (1995).  Under circuit precedent, evidence is "new" if it was unavailable at trial and "could not have been discovered earlier through the exercise of due diligence." *Nash v. Russell,* 807 F.3d 892, 899 (8th Cir. 2015) (quotations omitted).  To be actually innocent of the death penalty, Rankin must show "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found [him] eligible for the death penalty." *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992).  Death-penalty eligibility refers to the underlying guilty verdict and death-qualifying aggravators. *Wooten,* 578 F.3d at 781–82.  "The gateway should open only when a petition presents evidence of innocence so strong that a court cannot have confidence in the

outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *McQuiggin v. Perkins,* 569 U.S. 383, 401 (2013).

Earlier in the case, this Court—in the hearing order vacated post-*Shinn*–found Pastor Bailey's deposition was sufficient evidence to warrant a hearing on actual innocence as a gateway to consider procedurally defaulted claims. *Doc. No. 176, 183.* Based on further review and the alternative merits analysis set out herein, Rankin has not stated any claim of constitutional error. Because Rankin's trial was "free of nonharmless constitutional error," review of actual innocence as a gateway to review procedurally defaulted claims is unnecessary. *McQuiggin*, 569 U.S. at 401.

The United States Supreme Court has not decided whether a freestanding claim of actual innocence warrants federal *habeas* relief absent other constitutional error. *Id.* at 392. The threshold for proving a freestanding claim, if it exists, is higher than the gateway standard. *Id.* In light of Rankin's confession and other evidence linking him to the crime scene, he cannot meet the "extraordinarily high" threshold for demonstrating a freestanding actual-innocence claim. *Herrera v. Collins,* 506 U.S. 390, 417 (1993).

\* \* \*

For the reasons stated, the amended petition for writ of *habeas corpus*, *Doc. No. 115*, will be dismissed with prejudice. Judgment will be entered accordingly.

SO ORDERED this 22nd day of February, 2023.

_____
JAMES M. MOODY JR.
UNITED STATES DISTRICT JUDGE

## APPENDIX A

Claim 1—Rankin is actually innocent of capital murder.

Claim 2—Rankin is ineligible for the death penalty due to intellectual disability.

Claim 3—The trial lawyers' work was constitutionally ineffective for not investigating and presenting evidence that Rankin's brother, Rodney Rankin, committed the murders.

Claim 4—The trial court's failure to suppress Rankin's statement violated his constitutional rights, and the trial lawyers' related work was constitutionally ineffective.

Claim 5—The prosecutor unconstitutionally withheld or misrepresented evidence.

Claim 6—Penalty-phase instructions violated Rankin's constitutional rights, and the lawyers' related work was constitutionally ineffective.

Claim 7—The trial court's failure to instruct the jury on lesser-included offenses violated Rankin's constitutional rights, and the trial lawyers' related work was constitutionally ineffective.

Claim 8—Rankin's constitutional rights were violated by prosecutorial misconduct, and the trial lawyers' related work was constitutionally ineffective.

Claim 9—Rankin was not competent to stand trial, the trial lawyers' related work was constitutionally ineffective, and the prosecutor withheld related evidence.

Claim 10—The prosecutor's use of peremptory strikes in a discriminatory manner violated Rankin's constitutional rights, and the appellate lawyer's related work was constitutionally ineffective.

Claim 11—Rankin's right to an impartial jury was violated, and the trial lawyers' *voir dire* work was constitutionally ineffective.

Claim 12—The trial court's denial of Rankin's motion to change venue violated his constitutional right to a fair and impartial jury.

Claim 13—Rankin's constitutional rights were violated when jurors considered extraneous matters.

Claim 14—The trial lawyers' work was constitutionally ineffective during the sentencing phase.

Claim 15—Arkansas's capital murder statutes are unconstitutional.

Claim 16—The prosecutor presented unconstitutional testimony and argument about Rankin's silence during a psychiatric examination.

Claim 17—Rankin's conviction and sentence are unconstitutional because he was visibly handcuffed and shackled at trial.

Claim 18—Rankin's mental-health expert was inadequate, and the trial lawyers' related work was constitutionally ineffective.

Claim 19—Rankin is incompetent to be executed.

Claim 20—Rankin's death sentence is cruel and unusual punishment.

Claim 21—The trial judge was biased, and the trial lawyers' work was constitutionally ineffective in not seeking his recusal.

Claim 22—The trial and appellate lawyers had an unconstitutional conflict of interest.

Claim 23—The trial and appellate lawyers' work was constitutionally ineffective at trial and on direct appeal.

Claim 24—The post-conviction lawyer's work was constitutionally ineffective during post-conviction proceedings.

Claim 25—Rankin's convictions and death sentences should be vacated based on cumulative error.